IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| DAN GRAY, | ) | |
| | ) | |
| PLAINTIFF, | ) | |
| | ) | |
| VS. | ) | CAUSE NO. |
| | ) | 4:06-CV-985 (CEJ) |
| CABELA'S INCORPORATED AND | ) | |
| BBK ENTERPRISES, INC., | ) | |
| | ) | |
| DEFENDANT AND THIRD-PARTY PLAINTIFF, | ) | |
| | ) | |
| VS. | ) | |
| | ) | |
| CTI INTERNATIONAL, INC. | ) | |
| | ) | |
| THIRD-PARTY DEFENDANT. | ) | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

THE ORAL DEPOSITION OF

ALBERT ANSALDO

AUGUST 27, 2007

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

ORAL DEPOSITION of ALBERT ANSALDO,
produced as a witness at the instance of the
Third-Party Defendant CTI International, Inc., and
duly sworn, was taken in the above-styled and
numbered cause on the 27th day of August, 2007, from

EXHIBIT
7

1  9:05 a.m. to 2:04 p.m., before TAMMY ELLIS, CSR, in
2  and for the State of Texas, reported by stenographic
3  method, at the Law Offices of Prins & Arnwine,
4  4940 Broadway, Suite 108, San Antonio, Texas 78209,
5  pursuant to the Federal Rules of Civil Procedure and
6  the provisions stated on the record or attached
7  hereto.
8
9          S T I P U L A T I O N S
10
11         It is stipulated and agreed by and
12  between counsel for the respective parties hereto
13  that a transcript copy of the deposition of
14  ALBERT ANSALDO shall be sent to TODD A. PRINS for
15  the purpose of obtaining the signature of the
16  witness thereon before any notary public.

1              I N D E X
2
3  THE WITNESS:
4  ALBERT ANSALDO
5
6  Stipulations .................................   2
7  Index ....................................... 3 & 4
8  Appearances ............................... 5 & 6
9  Examination by Mr. Sanders ..................    7
10  Examination by Ms. Powers ...................  120
11  Examination by Mr. Zeidler ..................  183
12  Examination by Mr. Sanders ..................  223
13  Examination by Ms. Powers ...................  226
14  Witness' Signature Page .....................  240
15  Reporter's Certificate ......................  242
16
17            E X H I B I T S
18
                    PAGE
19  NUMBER  DESCRIPTION              MARKED
20  8 ....  Two-page document to Billy Wong from   107
        BBK Enterprises, Inc., dated July 14,
21       1999, Bates-stamped CTI000001 and
        CTI000002
22
    9 ....  Three-page document to Billy Wong from  111
23       Arla dated 8/06/99 Bates-stamped
        CTI000003 through CTI000005
24
25              Continued

1          Exhibits Continued
2
3  10 ...  Four-page document to Billy from    112
        Albert with drawings and handwritten notes
4       Bates-stamped CTI000066 through CTI000069
5  11 ...  Three-page document with drawings and  114
        handwritten notes Bates-stamped CTI000025
6       through CTI000027
7  12 ...  Three-page document to Tom Gallagher  161
        from Albert Ansaldo dated 3/22/02
8       Bates-stamped CTI000022 through CTI000024
9  13 ...  Six-page document to Billy from Arla  161
        dated 12/20/01 Bates-stamped CTI000060
10       through CTI000065
11
                -oOo-

1          A P P E A R A N C E S
2
3  FOR THE PLAINTIFF:
4
5       MS. LINDA C. POWERS
        DONALD L. SCHLAPPRIZZI, P.C.
        Attorneys at Law
6       Gateway One on The Mall
        701 Market Street, Suite 1550
7       Saint Louis, Missouri 63101
        PHONE: (314) 241-0763
8       FAX: (314) 241-0787
        EMAIL: linda@schlapprizzipc.com
9
10  FOR THE DEFENDANT CABELA'S INCORPORATED:
11
12       MR. EDWARD W. ZEIDLER, II
        BROWN & JAMES, P.C.
        Attorneys at Law
13       1010 Market Street, 20th Floor
        Saint Louis, Missouri 63101-2000
14       PHONE: (314) 242-5263
        FAX: (314) 242-5463
15       EMAIL: ezeidler@bjpc.com
16
    FOR THE DEFENDANT AND THIRD-PARTY PLAINTIFF
17  BBK ENTERPRISES, INC.:
18
        MR. TODD A. PRINS and
19       MS. ANGELA M. ARNWINE
        PRINS & ARNWINE
20       Attorneys at Law
        4940 Broadway, Suite 108
21       San Antonio, Texas 78209
        PHONE: (210) 820-0833
22       FAX: (210) 820-0929
        EMAIL: www.prinsarnwine.com
23
24          Continued
25

```
 1          Appearances Continued
 2
 3   FOR THE THIRD-PARTY DEFENDANT CTI INTERNATIONAL,
     INC.:
 4
 5        MR. STEVEN P. SANDERS
          WILLIAMS, VENKER & SANDERS, L.L.C.
 6        Attorneys at Law
          Bank of America Tower
 7        100 North Broadway, 21st Floor
          Saint Louis, Missouri  63102
 8        PHONE: (314) 345-5002
          FAX:   (314) 345-5055
 9        EMAIL: ssanders@wvslaw.com
10
     ALSO PRESENT:
11
12        ALBERT ANSALDO,
          The Witness; and
13
14        TAMMY ELLIS,
          Certified Shorthand Reporter.
15
16
17
18
19
20
21
22
23
24
25
```

```
 1              ALBERT ANSALDO,
 2   the witness, having been first duly cautioned and
 3   sworn to tell the truth, the whole truth, and
 4   nothing but the truth, testified as follows:
 5              EXAMINATION
 6   BY MR. SANDERS:
 7       Q.  State your name, please.
 8       A.  Before we go any further in this depo, I
 9   would like to have it notified that I have a hearing
10   impairment and I am -- I have dyslexia, so please
11   give me time to think of the question that you're
12   giving me and to answer it and to speak loudly.
13              And if I seem to be answering you
14   back in a loud voice, it's because I can't hear very
15   well with this impairment, so I'm ready to go.
16       Q.  All right.  Please state your name.
17       A.  Albert Ansaldo.
18       Q.  And, Mr. Ansaldo, as we go forward today,
19   any time you want to take a break, you say so, we'll
20   take a break.  If you don't understand what any of
21   the attorneys are asking you, just tell them and
22   they will make it more clear, hopefully.
23       A.  Yes, sir.
24       Q.  And take all the time you need to answer
25   the question.  That's not a problem.
```

```
 1              Now, for the record, I know you've
 2   given the court reporter your address before we were
 3   on the record, but officially what is your business
 4   address?
 5       A.  119 Bobby Lou, San Antonio, Texas, 78218.
 6       Q.  And what business is that, sir?
 7       A.  It is a distribution business of hunting.
 8       Q.  And what's the name of it?
 9       A.  BBK Hunting Systems, Limited.
10       Q.  All right.  And what is your position with
11   BBK Hunting Systems, Limited?
12       A.  I'm the owner.
13       Q.  All right.  And do you have -- Have you
14   given yourself a title as the owner?
15       A.  President.
16       Q.  All right.  Are there any other officers of
17   the company?
18       A.  One.
19       Q.  Who is that?
20       A.  My wife.
21       Q.  And what is her title?
22       A.  Vice President/Secretary.
23       Q.  All right.  And her first name is?
24       A.  Luanne.
25       Q.  When was BBK Hunting Systems formed?
```

```
 1       A.  I believe it was formed in 2004, if I'm --
 2   or 2005.  I really couldn't give you an actual date
 3   when it was formed.
 4              MR. PRINS:  Keep going.
 5              (Todd Prins left the
 6              proceedings at this time.)
 7       Q.  (By Mr. Sanders) All right.  When did --
 8   Well, first of all, what is the business of
 9   BBK Hunting Systems?
10       A.  It's a distributor of hunting stands.
11       Q.  Anything besides hunting stands?
12       A.  No, sir.  Feeders.
13       Q.  Okay.
14       A.  Hunting products.
15              (Todd Prins re-entered the
16              proceedings at this time.)
17       Q.  (By Mr. Sanders) And when did BBK Hunting
18   Systems actually commence doing business?
19              And the distinction I'm trying to
20   make here is a company might be formed but it may be
21   a year before it actually starts doing business.
22              What I'm trying to get at is when
23   did BBK Hunting Systems actually start conducting
24   business?
25       A.  At that point I cannot give you that exact
```

1  date.
2  Q.  Was it prior to 2007?
3  A.  Yes, it was.
4  Q.  Was it prior to 2006?
5  A.  Yes, it was.
6  Q.  You're not able to say then whether it was
7  in '04 or '05?
8  A.  Correct.
9  Q.  Does BBK Hunting Systems manufacture the
10  product that it sells?
11  And by "manufacture," I mean do you
12  own a factory?  Does the company own a factory?
13  A.  No, sir.  My company does not own a
14  factory.  Everything is subcontracted out using --
15  through an agent.
16  Q.  All right.  So basically BBK Hunting
17  Systems buys -- the product it sells, it buys that
18  product from someone else?
19  A.  Correct.
20  Q.  Okay.  Has that always been true for all
21  the time BBK Hunting Systems has been in business?
22  A.  Correct.
23  Q.  I'm -- I'm trying to talk loudly.  I don't
24  want to be too loud.
25  A.  No.  You're perfect.

1  Q.  So tell me if I'm --
2  A.  No.  You're perfect.
3  Q.  Okay.
4  A.  Your monotone is very -- is great.
5  Q.  Prior to or contemporaneous with,
6  whichever, BBK Hunting Systems being in business,
7  did you own a company known as BBK Enterprises?
8  A.  Inc., yes, sir.
9  Q.  BBK Enterprises, Inc.?
10  A.  Yes, sir.
11  Q.  All right.  And as we go through today, can
12  we just agree if I use the word "Enterprises," we
13  know we're talking about BBK Enterprises, Inc.  If I
14  use the word "Hunting," then we know we're talking
15  about the current company.
16  A.  LTD, Limited.
17  Q.  Limited.  Okay.
18  When, as best you can recall, was
19  Enterprises, Inc., incor -- or formed?
20  A.  In the year 1990, I believe.  '90 or '91.
21  Q.  And at that time were you the president of
22  the company?
23  A.  Yes, sir.
24  Q.  And was your wife the vice president?
25  A.  No, sir.

1  Q.  Were there any other officers besides you
2  in 1991?
3  A.  Yes, sir.
4  Q.  Who was that?
5  A.  Steve Jones.
6  Q.  Did he have an ownership interest?
7  A.  That, he did.
8  Q.  And what percentage?
9  A.  50 percent.
10  Q.  Did there come a point where you bought
11  Mr. Jones's interest out?
12  A.  Yes, sir.
13  Q.  When was that?
14  A.  Approximately in 1997 to '98.
15  Q.  All right.  And after you bought Mr. Jones
16  out, were you or you and your wife the sole owner of
17  Enterprises, Inc.?
18  A.  Yes, sir.
19  Q.  And at that point your wife became an
20  officer of the company?
21  A.  Correct.
22  Q.  Now, let's start then once you and your
23  wife were the sole owners of Enterprises, Inc., at
24  that point in time what was the business of
25  Enterprises, Inc.?

1  A.  Purchasing portable ground blinds from CTI
2  and distributing hunting blinds.
3  Q.  Okay.  Blinds only at that point?
4  A.  Blinds only, yes, sir.
5  Q.  Okay.  Was there any other -- Besides
6  purchasing blinds, hunting blinds, from CTI and --
7  and distributing them, was there any other business
8  that Enterprises, Inc., was doing back at the time
9  when you first took full ownership of the company?
10  A.  Other than public shows, Texas Trophy
11  hunting shows and small dealers, that is all.
12  Q.  Okay.  Did you expand the business into
13  other fields at some point after that; in other
14  words, beyond hunting blinds?
15  A.  Yes.
16  Q.  When did that start?
17  A.  1998.
18  Q.  Okay.  And what business did you expand
19  into?
20  A.  Tree stands.
21  Q.  So beginning at some point in '98,
22  Enterprises, Inc.'s, business or principal business
23  was hunting blinds and tree stands?
24  A.  Correct.
25  Q.  And then you had those little sideline

1  things you were telling me about?
2    A.  Correct.
3    Q.  Okay.  And at that point in time when you
4  expanded into tree stands, did you and your -- were
5  you and your wife the sole owners of the company?
6    A.  Correct.
7    Q.  At what point -- Well, let me ask this.  Is
8  Enterprises, Inc., still in business?
9    A.  No, sir.
10    Q.  At what point in time did Enterprises,
11  Inc., stop actively conducting business?
12    A.  I believe in the period of 2004.
13    Q.  All right.  Now here's what I want to see
14  if you can narrow down for me.
15          At some point in 2004, Enterprises,
16  Inc., stopped actively conducting business, correct?
17    A.  Correct.
18    Q.  At some point in 2004, Hunting, Limited,
19  started actively conducting business, correct?
20    A.  Correct.
21    Q.  Tell me was there any space in time between
22  Enterprises ceasing doing business and Hunting
23  beginning doing business or did that happen
24  simultaneously?
25    A.  I believe it happened simultaneously.

1    Q.  Okay.  Now, at the time -- let's say two
2  days before Enterprises, Inc., ceased doing
3  business, just to pick a time, essentially what were
4  the assets of Enterprises, Inc.?
5    A.  Zero.
6    Q.  Okay.  And I'm not actually asking for a
7  valuation so much as were there any assets --
8    A.  No, sir.
9    Q.  -- of any kind?
10         So you didn't have any inventory?
11    A.  No, sir.
12    Q.  Any accounts receivable?
13    A.  Over time, yes, but we could not collect
14  them.
15    Q.  All right.  But some accounts receivable
16  existed on paper at least?
17    A.  Correct.
18    Q.  All right.  Any accounts payable?
19    A.  No.
20    Q.  All right.  Any orders in place that had
21  either -- well, that had not yet been filled?
22    A.  No.
23    Q.  So let me see if I can summarize.  The
24  status of Enterprises, Inc., a few days before it
25  actively ceased business is it had no inventory, it

1  had no orders in hand, it had some accounts
2  receivable on paper at least and it had no -- no
3  outstanding debt?
4    A.  Correct.
5    Q.  Did it have a lease on office space?
6    A.  Yes.  At that time, yes.
7    Q.  What was the office -- the address of that
8  office space?
9    A.  I do not know it.
10    Q.  Okay.  How much time was left to run on it,
11  roughly?
12    A.  It was on a monthly basis with the
13  landlord.
14    Q.  Okay.  Did -- Did you -- Did Enterprises,
15  Inc., either own or have a lease on warehouse space?
16    A.  Never owned.
17    Q.  All right.  Did it have an existing lease
18  on warehouse space?
19    A.  Verbal, monthly.
20    Q.  Okay.  And who was the owner of that
21  warehouse?
22         Let me just ask:  Was it you or
23  your wife?
24    A.  No.  Nobody.
25    Q.  Any entity controlled by you or your wife?

1    A.  No.
2    Q.  When Hunting, Inc., started doing business,
3  okay, did it -- were the accounts receivable that
4  Enterprise, Inc., had transfer to Hunting, Inc. --
5    A.  To --
6    Q.  -- to Hunting, Limited?
7    A.  No.
8    Q.  All right.  Did Enterprise, Inc., then just
9  continue to try to collect those accounts
10  separately?
11    A.  I believe it did.
12    Q.  And was that kept as separate books from
13  Hunting?
14    A.  Of course.
15    Q.  And who was your accountant handling that
16  at the time?
17    A.  My wife.
18    Q.  Your wife.  Okay.
19         As a bookkeeper or is she trained
20  as an accountant?
21    A.  She's a full-blooded accountant.
22    Q.  Okay.
23    A.  CPA also.
24    Q.  Now, when Hunting, Limited, commenced doing
25  business, did it have -- use the same office space

1  that Enterprises, Inc., had been using?
2      A.  Yes.
3      Q.  And what was that address?
4      A.  119 Bobby Lou.
5      Q.  The same one as now?
6      A.  Correct.
7      Q.  Is that your home, by the way?
8      A.  No.
9      Q.  Is it like next door to or connected to
10  your home?
11      A.  No.
12      Q.  What is your home address?
13      A.  204 Bentley Manor, San Antonio, Texas.
14      Q.  The warehouse space that Enterprises, Inc.,
15  had been using, did Hunting, Limited, use that same
16  warehouse space?
17      A.  Correct.
18      Q.  And does it still today?
19      A.  It does.
20      Q.  Back before Enterprises, Inc., ceased doing
21  business, who was its distributor for the hunting
22  blinds?
23          I'm sorry.  Who was its vendor?
24  Who did you get them from?
25      A.  CTI.

1      Q.  And what about for tree stands?
2      A.  CTI.
3      Q.  Any other vendor that Enterprises right
4  before it ceased doing business -- any other vendor
5  that Enterprises was getting hunting blinds from?
6      A.  BBK Enterprises, Inc., CTI supplied the
7  entire inventory of that product line.
8      Q.  Same thing for tree stands?
9      A.  Same thing for tree stands.
10      Q.  And there were no other products really you
11  were selling, right?
12      A.  No, sir.
13      Q.  No, sir, there weren't or --
14      A.  Oh, no, sir.  There was not.
15      Q.  Sometimes that comes out funny on paper.
16      A.  I understand.
17      Q.  Once Hunting, Limited, started doing
18  business, right away as it started doing business,
19  who was its supplier for blinds?
20      A.  No one.
21      Q.  Okay.  Who -- Who did you get the blinds
22  from that you were selling?
23      A.  CTI.  I had a large inventory of defective
24  product and at that point could not sell any more,
25  so I'm still sitting on them.

1      Q.  Okay.  I'm not --
2      A.  I understand.
3      Q.  I'm not communicating here.
4          Once -- Once Hunting, Limited,
5  started doing business --
6      A.  Correct.
7      Q.  -- it started selling blinds to its
8  customers, didn't it?
9      A.  No.
10      Q.  All right.  So has Hunting, Limited, ever
11  sold blinds?
12      A.  No.
13      Q.  Okay.  Hunting --
14      A.  Yes.
15      Q.  Go ahead.
16      A.  Well, I'm just getting confused, the
17  Limited and the Enterprises.
18          Enterprises, Inc., always sold the
19  product.  At the point when the company closed down
20  in my warehouse is all the inventory, all the
21  product sitting there that is defective that we
22  cannot sell.
23      Q.  Okay.  Well, let's go back there for a
24  minute then.
25          So when Enterprises, Inc., closed

1  down business, it did have some inventory in a
2  warehouse?
3      A.  Correct.
4      Q.  All right.  And is this the same warehouse
5  that you had that verbal month-to-month lease on?
6      A.  Yes, it is.
7      Q.  What address is that?
8      A.  You asked me earlier.
9      Q.  You can't remember?
10      A.  I can't remember, no.
11      Q.  Okay.
12      A.  I can just tell you it's on Cross Country.
13      Q.  That's the name of a street?
14      A.  Yes, sir.
15      Q.  Here in San Antonio?
16      A.  Yes, sir.
17      Q.  All right.  So, in any event, when
18  Enterprises, Inc., closed down business, it had some
19  inventory in this warehouse; and was the inventory
20  entirely of blinds or were there other products,
21  too?
22      A.  Blinds.
23      Q.  So only blinds?
24      A.  Blinds and a product called a deer gambrel.
25  That is another item that CTI made for us.

6 (Pages 18 to 21)

1   Q.  Okay.  And approximately, either in number
2   of blinds or by value of blinds, how much inventory
3   was there?
4       A.  Cost, about $15,000.
5       Q.  Okay.  And these gambrels, about how much
6   inventory was there?
7       A.  Approximately $4,000.
8       Q.  All right.  Do those -- Are those still in
9   the warehouse?
10      A.  Yes, sir.
11      Q.  So that approximately $15,000 cost of
12  blinds is still sitting in the warehouse?
13      A.  Correct.
14      Q.  And the approximately 4,000 cost of
15  gambrels are still in the warehouse?
16      A.  Correct.
17      Q.  Are they carried on the books of
18  Enterprises?
19      A.  I believe, yes.
20      Q.  Who is currently paying the rent on that
21  warehouse space?
22      A.  BBK Hunting Systems, Limited.
23      Q.  Now, I want to go back to where I think we
24  were.
25          When Hunting -- BBK Hunting,

1   Limited, started doing business, okay, what -- what
2   were the product or products that it was selling
3   when it started doing business?
4       A.  Ladder stands.
5       Q.  And who was the supplier to BBK Hunting,
6   Limited, of ladder stands?
7       A.  A company in China called Winters.
8       Q.  W-I-N-T-E-R-S?
9       A.  Correct.
10      Q.  Okay.  Does it remain the supplier --
11      A.  No.
12      Q.  -- today?
13      A.  No.
14      Q.  But you're still selling ladder stands,
15  correct?
16      A.  Correct.
17      Q.  About how long before you started selling,
18  before Hunting, Limited, started selling these
19  stands made by Winters -- about how long before that
20  had you lined up Winters as a supplier to you?
21      A.  Probably three months.
22      Q.  Were there any supp -- When BBK
23  Hunting, Limited, started doing business, did it
24  have any suppliers of stands other than Winters?
25      A.  No.

1   Q.  Now, BBK Hunting, Limited, does it now sell
2   something other than stands?
3       A.  A wooden box.
4       Q.  Okay.  Does that have a name other than
5   wooden box?
6       A.  A camp house.  That's what we call it.
7   It's a portable hunting box, a shooting house.
8   It's -- It's hard to explain, but it's a wooden box
9   that KD's down and comes in a package.
10      Q.  When -- About when did that become a
11  product line that Hunting, Limited, started selling?
12      A.  This year.
13      Q.  All right.  So it just started in '07?
14      A.  Correct.
15      Q.  Other than tree stands and the wooden
16  box --
17      A.  Yes, sir.
18      Q.  -- any other product line that Hunting,
19  Limited, sells?
20      A.  None.  That's it.
21      Q.  And has -- Have those been the only two
22  products that Hunting, Limited, has ever sold?
23      A.  Other than the shooting stick.  I mean,
24  it's not a tree stand.  It's an accessory item.  We
25  have -- like the deer gambrel, which it's still in

1   inventory, the shooting stick; that's all.
2       Q.  That's it then?
3       A.  Correct.
4       Q.  Okay.  Did -- By the time that Enterprises,
5   Inc., was ceasing business, were there any employees
6   of the company other than you and your wife?
7       A.  When it ceased to exist?
8       Q.  Well, let's say in the last month before it
9   ceased to exist.
10      A.  No.  There was nobody.  We had -- We let go
11  of the gentleman that was working at the time when
12  BBK Enterprises existed and we had to close the
13  door --
14      Q.  Okay.
15      A.  -- and we had to let him go.
16      Q.  Before you let him go, then there was just
17  one other employee?
18      A.  Correct.
19      Q.  All right.  Was he like a warehouse man or
20  what?
21      A.  He was my assistant, like assistant
22  manager, traveled to shows and did -- went to China
23  on my behalf at times.
24      Q.  Okay.  When -- When Enterprises, Inc., was
25  actively in business, did it actually warehouse

1  anything or did it simply do the paperwork of buying
2  from its vendor and having the vendor ship directly
3  to a customer?
4      A.  For this incident for Cabela's, I never
5  received a product at all in my door.
6      Q.  Okay.  But I'm asking generally, did
7  Enterprises, Inc., ever warehouse items?
8      A.  Yes.  Yes.
9      Q.  Did you have employee or employees that
10 worked in the warehouse?
11     A.  No.
12     Q.  So it was you and your assistant and your
13 wife that would take care of any unloading into the
14 warehouse and loading back up out of the warehouse?
15     A.  You're looking at him.
16     Q.  Okay.  Does Hunting, Limited, have any
17 employees other than you and your wife?
18     A.  My secretary, Arla May.
19     Q.  Okay.  Was she a secretary too at
20 Enterprises?
21     A.  Correct.
22     Q.  Was -- Was there ever a period of time
23 where she was let go or laid off, or did she stay
24 with you throughout the whole time?
25     A.  She stayed with me throughout the whole

1  time.
2      Q.  I want to go back and -- and -- in time now
3  and talk about Enterprises, Inc., and its business
4  with CTI.
5          I think you told me that you got
6  into -- Enterprises, Inc., got into the tree stand
7  business in, what, '98 or '99, did you say?
8      A.  '98, yes.
9      Q.  1998.  All right.
10         That was before you had started
11 doing any business with CTI on tree stands, correct?
12     A.  Correct.
13     Q.  Were -- Was BBK -- and let's -- from now on
14 I'm only going to be talking about BBK Enterprises.
15 All right?
16     A.  I understand.
17     Q.  So was BBK Enterprises, back in 1998,
18 selling tree stands on its own like down here in
19 Texas under its own name?
20     A.  Yes.
21     Q.  Okay.  Did -- You didn't have any retail
22 outlets, I take it?
23     A.  No.
24     Q.  So you would sell to other stores that were
25 retailers?

1      A.  Correct.
2      Q.  And were -- were the tree stands back at
3  that time in '98, did they actually have some kind
4  of label or tag on them that said BBK?
5      A.  Correct.
6      Q.  Where were -- Where were you getting those
7  since you weren't manufacturing them yourself?
8      A.  Mexico.
9      Q.  Was there a company?
10     A.  Yes.
11     Q.  What was its name?
12     A.  I want to say -- it's been so long -- it's
13 Luz De -- Mexico De La Luz.  It was a light factory
14 and converted into a steel plant, and they still
15 kept the name.
16     Q.  What town was it in?
17     A.  Nuevo Laredo.
18     Q.  And what I want to find out now is for
19 those stands that you were getting from that -- that
20 factory in Mexico back in 1998, did that factory
21 come up on its own with tree stands and you started
22 buying from it or did they manufacture those tree
23 stands to your design?
24     A.  They were already manufacturing tree stands
25 at the point I walked in that door.

1      Q.  Okay.  Before you walked in that door in
2  Nuevo Laredo, were you -- was Enterprises, Inc.,
3  selling tree stands?
4      A.  No.
5      Q.  So was this a new product line for
6  Enterprises when you walked in the door in
7  Nuevo Laredo?
8      A.  Correct.
9      Q.  And you walked in that door and the factory
10 there in Nuevo Laredo had tree stands that they were
11 making on their own?
12     A.  Correct.
13     Q.  You looked over the tree stand?
14     A.  Correct.
15     Q.  And at some point after walking in that
16 door, you got in the business of buying tree stands
17 from that factory and selling them at least here in
18 Texas under the BBK name?
19     A.  Correct.
20     Q.  Do you know who designed those tree stands?
21     A.  The tree stand was a knockoff from a
22 current manufacturer on the market named Wahoo at
23 that time, Wahoo tree stands.
24     Q.  W-A-H-O-O?
25     A.  Yes.

1   Q.  Name a tree stand after a fish.
2   A.  I understand.
3        MR. PRINS:  You're not going to get
4 a lot of fish from it, I wouldn't think, but...
5        THE WITNESS:  That was the name of
6 the company.
7   Q.  (By Mr. Sanders) All right.  Did you start
8 buying and then selling those tree stands from that
9 Mexican factory as is or did you require them to --
10 to change or modify the design in some way?
11   A.  As is.
12   Q.  Okay.  When -- Was there some point when
13 you approached Cabela's about buying tree stands
14 from BBK Enterprises?
15   A.  Yes.
16   Q.  Approximately when?
17   A.  1999.
18   Q.  And do you remember what portion of that
19 year it happened in that you approached Cabela's the
20 first time?
21   A.  My first time, I believe it was in the
22 early part of April.
23   Q.  And was it Mr. Gallagher that you
24 approached?
25   A.  Tom Gallagher.

1   Q.  Okay.  Where did that meeting take place?
2   A.  Sidney, Nebraska; corporate.
3   Q.  Cabela's corporate headquarters?
4   A.  Yes, sir.
5   Q.  Did you take a sample of the tree stand
6 with you that you were wanting them to buy from you?
7   A.  That, I did.
8   Q.  And was it the tree stand that you were
9 getting from Nuevo Laredo?
10   A.  Yes, sir, it was.
11   Q.  All right.  And did Cabela's agree during
12 that meeting to start buying from you, or did it
13 take a little bit of time in salesmanship?
14   A.  No, sir.  They bought the stand.  They
15 wanted to view the factory in Mexico prior to
16 committing, but they -- within a less than two weeks
17 period, they were down from corporate, into
18 Nuevo Laredo to view the facility and to see if it
19 would be able to maintain their business.
20   Q.  Okay.  So the sequence then is early April,
21 roughly, of 1999, you go to Cabela's, meet with
22 Mr. Gallagher, you have a tree stand with you, you
23 make the sales pitch, right?
24   A.  Correct.
25   Q.  And Mr. Gallagher tells you during that

1 meeting they'd like to sell the stand but they want
2 to see the factory first?
3   A.  Correct.
4   Q.  So within a couple of weeks, you and
5 Mr. Gallagher go to the factory in Nuevo Laredo?
6   A.  Yes, sir.
7   Q.  After that, did -- right away after that,
8 did Cabela's start buying stands from you?
9   A.  Yes.
10   Q.  Did Cabela's require or state that they
11 were requiring any modification in that stand
12 design?
13   A.  At that point, no.
14   Q.  At that point is what I'm talking about,
15 so...
16   A.  Everything was the same.
17   Q.  All right.  And then, in fact, did you
18 start selling that particular tree stand to
19 Cabela's?
20   A.  That, I did.
21   Q.  When that occurred -- and by "that," I mean
22 you've gone to corporate headquarters for Cabela's,
23 then you've gone to the factory with Mr. Gallagher
24 in Nuevo Laredo.  About how long after that trip to
25 Mexico before you actually started having product

1 shipped to Cabela's?
2        Was it a week, a month?  What would
3 you guess?
4   A.  It was several months that we had to go
5 into the process of gathering product, material,
6 ordering, and go into the production.
7   Q.  Okay.  Explain --
8   A.  Orders were cut.
9   Q.  Explain what you mean about gathering
10 product material.
11   A.  Well, the gentleman -- the gentleman at the
12 factory would order his steel, order the rope,
13 getting everything lined up to come in to meet at
14 the time that Cabela's wanting their stands to start
15 to be delivered to their facility in their
16 warehouse.
17   Q.  I think I see the point, so let me ask it
18 this way.
19        You're at the factory with
20 Gallagher.  Okay?  Did he have some point in time
21 after that when he said, "This is when we're first
22 going to want to start receiving the tree stands"?
23   A.  Yes.
24   Q.  When was that?
25   A.  July.

1   Q.  Okay.
2   A.  Because their August -- their archery book
3   where this product goes into comes out the first of
4   August, I believe.
5   Q.  All right.  So what he told you is "We've
6   got a target date of July to start getting these
7   stands from you"?
8   A.  Or sooner, yes, sir.
9   Q.  Okay.  And it was between April and July
10  that the factory was starting to gear up to be able
11  to deliver?
12  A.  Correct.
13  Q.  Okay.  Now, when the factory then first
14  started producing those stands in July of 1999,
15  approximately, did they come with assembly
16  instructions?
17  A.  Yes, they did.
18  Q.  Who had put together those assembly
19  instructions?
20  A.  I did.
21  Q.  Okay.  And --
22          MR. SANDERS:  I hope we're not
23  disturbing your --
24          MR. PRINS:  Oh, no, no, no.
25          MR. SANDERS:  Okay.

1   Q.  (By Mr. Sanders) Had -- I should ask this.
2   Before you started selling to Cabela's, I know you
3   were selling at least in some places with the BBK
4   name on the stand, right?
5   A.  Correct.
6   Q.  Did those come with assembly instructions?
7   A.  Yes.
8   Q.  And had you put those assembly instructions
9   together?
10  A.  That, I did.
11  Q.  So the assembly instructions that existed
12  when you were only selling under the BBK name, did
13  those change when you started selling them to
14  Cabela's?
15  A.  Yes.
16  Q.  And how -- Tell me how it came about that
17  they changed.
18  A.  Well, Cabela's wanted their name on that
19  product and they put -- we sent our instructions to
20  them.  They approved them.  We put the Cabela's
21  name, address, information on it.  They approved
22  them, and we sent them back into production.
23  Q.  Okay.  So, really, then the only difference
24  between the instructions that existed when you were
25  only selling under the BBK name from when you

1   started selling to Cabela's -- the only change in
2   those instructions was the instructions now said
3   Cabela's and had its address and its phone number,
4   Cabela's information?
5   A.  Up to that point, yes.
6   Q.  At that point in time, right.
7   A.  Yes.
8   Q.  Okay.  Now, I'm going to show you, if I can
9   find it... Mr. Gallagher's deposition was taken
10  last week, as I -- I believe you know.
11  A.  I understand.
12  Q.  And there were a series of instructions
13  that were identified.  And -- And to be fair to you,
14  I'm going to tell you that Mr. Gallagher said that
15  Exhibit Number 5 -- there you see the 5
16  (indicating)?
17  A.  Right.
18  Q.  -- that Exhibit Number 5 instructions were
19  the very first ones that were used and that
20  Exhibit 4 instructions came about later
21  (indicating).
22          So you take your time and look at
23  these for a moment and then I'm going to ask you if
24  you agree with that.
25  A.  No.  I don't agree with them.

1   Q.  Okay.  Now, let's -- let's first turn --
2   Well, let's do it this way.  You have in front of
3   you Exhibit 5 and Exhibit 4.
4   A.  Yes.
5   Q.  Okay?  This is Exhibit 5 (indicating).
6   That's Exhibit 4 (indicating).
7          Do either of those look like the
8   instructions that were first supplied with the
9   product when you first started selling it to
10  Cabela's?
11  A.  This one does (indicating).
12  Q.  Okay.  And I probably had you confused with
13  numbers.  Because you're pointing at Exhibit
14  Number 5, correct (indicating)?
15  A.  Correct.
16  Q.  And, in fact, Mr. Gallagher said that
17  Exhibit Number 5, this one, was the first one used
18  (indicating).
19  A.  Correct.
20  Q.  So you agree with that?
21  A.  That, I do.
22  Q.  Okay.  And so Exhibit Number 5 are the
23  instructions that you had drafted back when you were
24  first -- Let me start over because I don't -- Strike
25  that.

1    Exhibit Number 5, I notice, does
2  not have anybody's name on it, and it may just be
3  cut off someplace when it was copied.  But as far as
4  what we see on Exhibit Number 5, are these the
5  instructions that you drafted and were in use back
6  when you were just selling the ladder as BBK ladder
7  (indicating)?
8    A.   It -- It -- It is.
9    Q.   Except it may be missing the name.
10   A.   Well, I understand that.  But also they are
11  not the original instructions.
12   Q.   Okay.
13   A.   And --
14   Q.   Go -- Explain what you mean by that.
15   A.   Can I have a break for a second?
16   Q.   Yeah.
17       MR. PRINS:  Sure.
18       THE WITNESS:  Let's talk.
19       MR. PRINS:  Okay.
20       THE WITNESS:  Can I have this,
21  please (indicating)?
22       MR. SANDERS:  You can take both of
23  them if you'd like.
24       (Recess taken.)
25   Q.   (By Mr. Sanders) Okay.  Now, let's go back

1  to where we were.  And to set the timeline, we know
2  that in April of 1999, you were talking with
3  Cabela's for the first time about Cabela's buying
4  tree stands from you, right?
5    A.   Correct.
6    Q.   And then we know that Cabela's agreed to
7  start buying tree stands from you and told you that
8  they'd like to start having them delivered by July
9  of '99?
10   A.   In that time.
11   Q.   In that time frame, roughly?
12   A.   Yes, sir.
13   Q.   Okay.  Now, in that April to July of 1999
14  time frame and by the time you first started
15  delivering the 15-foot tree stands to Cabela's, as I
16  understand it, Exhibit 5 was the instruction
17  materials that were being used with the stand except
18  maybe with the name of Cabela's above the -- the
19  15-foot ladder reading?
20   A.   Yes.
21   Q.   Is that correct?
22   A.   Yes.
23   Q.   Okay.  And these were ones that you had
24  drafted at some point prior to July of 1999?
25   A.   No, they're not.

1    Q.   Okay.  Explain where they came from.
2    A.   They came from Billy, CTI.
3    Q.   All right.  Now you weren't doing business
4  yet with Billy, right?
5    A.   At that point -- I'm going to explain this
6  to you.  Okay?
7    Q.   Now answer my question and then you can
8  explain.
9        Were you doing business with Billy
10  Wong for tree stands in April of 1999?
11   A.   We were discussing it.
12   Q.   Were you buying tree stands from CTI in
13  April of 1999?
14   A.   Not in April.
15   Q.   What about July of 1999?
16   A.   I believe so.
17   Q.   Okay.  What about the Mexican factory, were
18  you buying them from the Mexican factory in July of
19  1999?
20   A.   That, I was.
21   Q.   All right.  And the tree stand that you
22  showed Mr. Gallagher was from the Mexican factory?
23   A.   Correct.
24   Q.   And the tree stand that you looked at in
25  the Mexican factory was the Mexican factory's tree

1  stand?
2    A.   Correct.
3    Q.   And the tree stand that Mr. Gallagher
4  agreed to buy from you in April of 1999 was the one
5  from the Mexican factory?
6    A.   Correct.
7    Q.   Okay.  And the tree stand you started
8  shipping in approximately July of 1999 to Cabela's
9  was from the Mexican factory?
10   A.   Correct.
11   Q.   All right.  And that was the same one you
12  had been selling under the BBK name prior to that?
13   A.   Correct.
14   Q.   All right.  Now, the one that -- then that
15  you had been selling under the BBK name and that you
16  started shipping to Cabela's in July of 1999 came
17  with assembly instructions?
18   A.   Correct.
19   Q.   And those were assembly instructions that
20  you had drafted?
21   A.   Correct.  And approved by Cabela's.
22   Q.   And approved by Cabela's.  Fine.
23       And those assembly instructions
24  were Exhibit 5 (indicating)?
25   A.   No.

1    Q.  Okay.  Where are they, the ones that you
2  then gave to Cabela's in July of 1999?
3    A.  They are exactly of -- the same as these
4  without the 7 and 3 being misplaced.  And at that
5  point, I have no other -- no other copy of that
6  instruction because in the period of 1999, Billy
7  Wong started my production.  And if you would see on
8  these instructions stated, there's a CTI number on
9  this one, which is the very first one for Billy
10  Wong's production (indicating).
11    Q.  Show me the CTI number.
12    A.  (Witness complies.)
13    Q.  Sir, I put that on there.
14    A.  You put that on there?
15    Q.  I did.
16    A.  Are you sure?
17    Q.  I think so.
18    A.  Well, you better make sure.
19    Q.  So your story then is that the assembly
20  instructions that you had drafted --
21    A.  Yes.
22    Q.  -- all right, and that you were using with
23  BBK and that you were providing to Cabela's in July
24  of 1999 are exactly like Exhibit 5 except for the
25  numbering that goes 1, 2, 7?

1    A.  Correct.
2    Q.  All right.  And do you have a copy of that
3  anywhere?
4    A.  No, sir.  Not at my present time.
5    Q.  All right.  And if Mr. Gallagher has
6  testified that Exhibit 5 is exactly what you were
7  giving him, then you disagree with him?
8    A.  Yes.
9    Q.  Okay.  Did there come a point in time where
10  the wording of Exhibit 5 of the instructions that's
11  Exhibit 5 changed in some way?
12    A.  No, not the wording.
13    Q.  All right.  I'll show you Exhibit 4.  I
14  want you to look at those and tell me if you think
15  they're different in some way.
16    A.  Yes.
17    Q.  Okay.  Tell me the difference you find.
18    A.  Well, it's the safety cross straps.  This
19  in Exhibit 5 shows that there's no safety cross
20  straps that came out in the first year (indicating).
21         And in the second year, we put the
22  safety cross straps on here (indicating).
23    Q.  All right.  Now, if we look at both of
24  them, Exhibit 5 and Exhibit 4 both have a section
25  labeled "Contents of Your Box," correct

1  (indicating)?
2    A.  Yes.
3    Q.  Those are different, aren't they?
4    A.  "Contents of Your Box," yes.
5    Q.  Because in Exhibit 4, there are two
6  additional items listed as "Contents of Your Box"
7  that are not listed in Exhibit 5 (indicating).
8    A.  Correct.
9    Q.  And those items are H which says --
10    A.  Safety cross strap.
11    Q.  -- "two 12-foot webbings" --
12    A.  Yes.
13    Q.  -- correct (indicating)?
14    A.  Correct.
15    Q.  And Item I which says "two steel braces,"
16  correct (indicating)?
17    A.  Correct.
18    Q.  Okay.  And Exhibit 4 also has an
19  illustration for Exhibit I showing the two steel
20  braces that Exhibit 5 does not have.
21    A.  Correct.
22    Q.  And that was because at some point in time
23  those items were added to the box.
24    A.  No, sir.
25    Q.  All right.  Were they always in the box?

1    A.  Yes, sir.
2    Q.  All right.  So Exhibit 5 -- When Exhibit 5
3  was used as instructions, the two steel braces and
4  the two 12-foot webbing straps were in the box, they
5  just weren't listed on the contents of the box?
6    A.  No, sir.  The 12-foot webbing, as it shows
7  in this photo, was never in this box because it was
8  never put in.  And it wasn't -- This was an add-on in
9  the following year (indicating).
10         And the other item that's in here
11  that's taken this up that replaces the two metal
12  straps are these two cables (indicating).  The
13  cables are in here.  They're not listed, but the
14  cables are shown in the photo where they go in place
15  as of this (indicating).
16    Q.  Okay.  Let's -- Since we're pointing and
17  talking, it won't come across --
18    A.  Okay.
19    Q.  -- in writing.
20         Let's do it this way.  First on
21  Exhibit 5, at the bottom left-hand part of the page,
22  there's a heading that says "How to Assemble Your
23  Cabela's 15-Foot Ladder," correct (indicating)?
24    A.  Correct.
25    Q.  And you were pointing to underneath that,

12 (Pages 42 to 45)

1 the illustration that is at the top left-hand side.
2 It's got a single platform-like piece, right
3 (indicating)?
4    A.   Correct.  It's a cable.
5    Q.   And there are two cables shown on that
6 (indicating)?
7    A.   Correct.
8    Q.   All right.  Those were items that were
9 present at that point in time but not listed in the
10 "Contents of Your Box" part?
11    A.   Correct.
12    Q.   All right.  And you're saying that when
13 Exhibit 4 was created, those cables no longer were
14 in use, correct?
15    A.   Correct.
16    Q.   And they were replaced by what?
17    A.   J, the two metal bars right here
18 (indicating).
19    Q.   All right.  The two metal bars that are
20 Item I in "Contents of Your Box" of Exhibit 4
21 (indicating)?
22    A.   Correct.
23    Q.   Okay.  And that's why Item I, those two
24 metal bars, is not in Exhibit 5 (indicating).
25    A.   Correct.

1    Q.   All right.  Now, Exhibit 4 in the contents
2 also has Part H, two 12-foot webbings (indicating).
3    A.   Correct.
4    Q.   Were 12-foot webbing straps included in the
5 box that was shipped when Exhibit 5 was being used?
6    A.   No, sir.
7    Q.   Tell me when that change came about, when
8 you started using or putting in the box the 12-foot
9 webbings and the two steel braces.
10    A.   I believe the -- in the year 2000, we went
11 to the solid braces and the webbing.
12    Q.   Okay.  And that was in the year 2000.  And
13 that would mean the shipping of that was probably,
14 what, in the July of 2000 time frame?
15    A.   Yes, sir.
16    Q.   And so production would have preceded July
17 of 2000 by a few months?
18    A.   Yes, sir.
19    Q.   Okay.  And so Exhibit 5 assembly
20 instructions were modified to what we see in
21 Exhibit 4 because of that change of contents of the
22 box?
23    A.   Correct.
24    Q.   All right.  Who made that change in
25 Exhibit -- from Exhibit 5 to Exhibit 4?  Did you do

1 that?
2    A.   Both Cabela's and I.
3    Q.   All right.  You and Cabela's combined.
4         And who -- who at Cabela's worked
5 with you on that?
6    A.   Tom Gallagher.
7    Q.   Anybody else?
8    A.   At that time, Doug Zingula.
9    Q.   Anybody else?
10    A.   Not that I'm aware of.
11    Q.   All right.  So the changes from Exhibit 5
12 to Exhibit 4 took place sometime prior to July of
13 2000?
14    A.   Correct.
15    Q.   And they were accomplished by a combination
16 of you, Mr. Gallagher and Mr. Zingula?
17    A.   Correct.  But there is -- You have --
18 You're asking me a question that is actually prior
19 to that, of 2000, when the corrections of those --
20 how do I say -- These instructions here --
21    Q.   Number 5 you're pointing at.
22    A.   -- Number 5, are not the original
23 instructions that came from the original BBK stand
24 that was manufactured in Nuevo Laredo (indicating).
25         These instructions --

1    Q.   Number 5 again.
2    A.   -- Number 5, were modified when CTI was
3 given the right to build the additional ladders and
4 the remaining PO's, and CTI and the factory
5 redesigned this ladder to come in a KD form, okay,
6 to where we could get more in a container
7 (indicating).
8         So we basically took the basic
9 outline of these instructions, put the modifications
10 that CTI and the factory did for this product and
11 created these instructions, approved by Tom
12 Gallagher, and we sent these instructions over there
13 and they were put in a box (indicating).
14    Q.   Okay.  We're going to have to back up and
15 start again then --
16    A.   Okay.  Yes.
17    Q.   -- so we got all this.
18         Let's go to April of 1999.
19    A.   Okay.
20    Q.   And you're at Cabela's and you've got a
21 tree stand with you and it came from the Mexican
22 plant.
23    A.   Yes, sir.
24    Q.   Okay.  And that was -- that was the tree
25 stand that somebody had designed and the Mexican

1 plant was already manufacturing?
2    A. Correct.
3    Q. And that's what Cabela's said they were
4 going to buy?
5    A. Correct.
6    Q. And there were no modifications made to
7 that design that the Mexican plant was
8 manufacturing?
9    A. Correct.
10    Q. And that was the stand that you started
11 shipping in approximately July of 1999?
12    A. At the beginning.
13    Q. Okay. That's the stand that you first
14 started shipping to Cabela's in approximately July
15 of 1999?
16    A. Correct.
17    Q. Does Exhibit 5 represent the assembly
18 instructions that accompanied the stand in July of
19 1999 coming from the Mexican plant (indicating)?
20    A. No.
21    Q. Okay. Where are those instructions?
22    A. I have them -- I do not have them.
23    Q. Okay. That -- That -- Okay. Let's make
24 sure we --
25    A. Okay. I do not have them at my present

1 time, the original instructions of that original one
2 done in 1998.
3    Q. All right. Do you know where they are at
4 all?
5    A. No, sir, I don't.
6    Q. And if Cabela's says that Exhibit 5 was
7 them, then you disagree (indicating)?
8    A. I disagree to a point.
9    Q. Okay. Tell me to what point.
10    A. Okay. To the point to where the original
11 stands that were coming out of Mexico, okay, were
12 built in a solid piece. And I will explain this to
13 you.
14         The entire upper portion of this
15 stand right here was welded together (indicating).
16 This elbow -- see this elbow right here in
17 Exhibit 5, that was all one piece and it was welded
18 (indicating).
19         In order for the Chinese factory at
20 the time in mid 1999 when Mr. Wong was given a
21 sample, the factory went in and designed this elbow
22 to be able to make a box that was this tall because
23 everything that was coming from the original Mexican
24 factory was all built in one piece, welded, the --
25 other than the cable, all this piece and the

1 foot plat -- I mean the seat platform, it was all
2 welded together (indicating).
3         When Mr. Wong was given the
4 opportunity, which is --
5    Q. We're going to get to Mr. Wong.
6    A. -- with CTI --
7    Q. I'm going to take this a piece at a time.
8    A. Okay. They --
9    Q. So you're saying then that what was shipped
10 from the Mexican factory, we don't have the
11 instructions?
12    A. Correct.
13    Q. All right. And you don't know where they
14 are?
15    A. No, I don't.
16    Q. And so Exhibit Number 5 does not represent
17 instructions that came with the product from the
18 Mexican factory (indicating)?
19    A. Correct.
20    Q. Okay. And whatever instructions came with
21 the product from the Mexican factory, those
22 instructions you wrote?
23    A. Yes.
24    Q. Okay. Now, we move ahead.
25         Did the instructions that you wrote

1 for the product that came from the Mexican factory,
2 did those ever change during the time you were still
3 getting product from the Mexican factory?
4    A. They changed when Cabela's agreed to buy
5 the CTI ladder.
6    Q. Okay. But as long as you were getting the
7 product from the Mexican factory, did those
8 instructions change?
9    A. No, sir. Not at all.
10    Q. Okay. Now, there came a point where you
11 had problems with delivery schedules or something
12 like that from Mexico, right?
13    A. Correct.
14    Q. What were those problems?
15    A. Just "Manana."
16    Q. In other words, they were not able to
17 deliver as promised?
18    A. As promised.
19    Q. Time-wise?
20    A. Time-wise. And then the additional PO's
21 that came on top of BBK Enterprises, Inc., from
22 Cabela's.
23    Q. You mean a volume problem, too? They
24 couldn't produce the volume?
25    A. Well, I was given one PO for the Mexican

1  factory. And when the catalogue came out, they
2  called me up and they said, "We're -- We
3  underestimated our volume of sales."
4      Q.  Cabela's you're talking about?
5      A.  Yes.
6          So when I had my meeting with them
7  and they told me what the volume was at that point,
8  I told them I couldn't do it in the Mexican factory.
9  And I had told them at that time that CTI, Billy
10  Wong, had a sample in his hand and that just out of
11  pure coincidence that that sample would be back at
12  my office.
13          When I came back from the meeting,
14  I looked at -- I looked at the ladder. The ladder
15  was pristine. It was a beautiful-made ladder. I
16  forwarded that ladder to Tom Gallagher for their
17  approval to have that ladder made in China. And for
18  the remainder of the PO's that was coming out of
19  China that -- that we had to fulfill in a certain
20  amount of -- period of days, they agreed for that
21  ladder.
22          So at that point we modified
23  them -- the drawings -- of the original BBK
24  instructions and that's what they came out.
25  Cabela's approved the modification of the ladder and

1  the instructions.
2          We forwarded that over to CTI to be
3  put in for the ladder stands. And when the ladders
4  came over, it seemed that the production of 2000 --
5  of '99 and the production of 2000 -- the only thing
6  changed was the differences of the parts and the
7  webbing in 2000 compared to '99, Exhibit 5
8  (indicating).
9          At that point CTI had done all
10  the -- we had -- we -- Cabela's approved them. We
11  did them. Cabela's approved them. We forwarded
12  them to CTI. And how they got to that situation in
13  numbers, I don't know.
14      Q.  Okay. Now, let's break this down into
15  pieces.
16      A.  Okay.
17      Q.  So we're sometime after July -- We're in
18  '99?
19      A.  Yes, sir.
20      Q.  We're sometime past July and Cabela's is
21  coming to you and saying, "Gosh, we need more than
22  what we thought"?
23      A.  Correct.
24      Q.  About when did that happen?
25      A.  I want to say August.

1      Q.  Of '99?
2      A.  Correct.
3      Q.  And who was it from Cabela's that told you
4  this?
5      A.  Tom Gallagher.
6      Q.  Okay. Was this over the phone, person to
7  person, by a letter; how did it happen?
8      A.  On the phone, "Get yourself up here
9  tomorrow. We have a problem."
10      Q.  Okay. So August of '99, approximately
11  August of '99, Gallagher calls you on the phone,
12  says, "Get up here to Nebraska. We have a problem"?
13      A.  Correct.
14      Q.  So did you get up there to Nebraska?
15      A.  Next day.
16      Q.  All right. And so now you have a
17  face-to-face meeting with Gallagher?
18      A.  Correct.
19      Q.  Anybody else from Cabela's present?
20      A.  All of them, the four kings.
21      Q.  Well, I've -- I've never met a king in my
22  life, so tell me.
23      A.  Well --
24      Q.  Gallagher is one. Who else?
25      A.  -- Doug Zingula, Brian somebody, and

1  another gentleman that I can't remember the name.
2      Q.  Any description that would help Cabela's
3  counsel identify him?
4      A.  No. I can't -- Brian. He's one of the top
5  ones. I'm --
6      Q.  Okay.
7      A.  I --
8      Q.  So we've got a meeting in August of '99 at
9  Cabela's headquarters with Gallagher, Zingula, Brian
10  somebody and a fourth person?
11      A.  Correct.
12      Q.  Okay.
13      A.  I believe Tom's assistant.
14      Q.  Tom's assistant.
15          Tell me what they said to you at
16  that meeting.
17      A.  "It's a hot item. We need more product.
18  Can you produce that in the Mexico factory?"
19      Q.  Tell me what kind of volume they were
20  telling you they needed compared to what they had
21  originally told you.
22      A.  My initial orders were -- were
23  approximately 15,000 ladders coming out of the
24  Mexican factory. That was my initial order. And
25  that's what I anticipated on building.

15 (Pages 54 to 57)

1 Q. Okay.
2 A. Along with another item that this doesn't
3 have to pertain to, but this is ladders.
4 Q. Okay.
5 A. When the catalogue -- When the archery
6 catalogue came out several weeks after, they called
7 me up and said, "Get up here." And then they said,
8 "We need an additional 30,000 ladders to be here in
9 90 days."
10 Q. That's in addition to the first 15,000?
11 A. Correct.
12 Q. Okay.
13 A. Okay? And I told them I could not produce
14 those in the Mexican factory because of being so
15 slow.
16 Q. Okay. And they said what?
17 A. They said, "You've got to do something. We
18 can't lose sales."
19 Q. All right. Did they tell you they were
20 going to take your original order away from you?
21 A. No.
22 Q. They just said, "Do something"?
23 A. "Please do something."
24     And at that point in time, with my
25 relationships with CTI, he -- Billy had been asking

1 meeting at Cabela's. You've been told "Do
2 something. Get us some more tree stands"?
3 A. Correct.
4 Q. All right. And you had a relationship with
5 CTI on these other products?
6 A. Correct.
7 Q. And Billy was saying, "Send me a sample of
8 a tree stand I can bid against"?
9 A. Correct.
10 Q. And did you do that?
11 A. Yes, I did.
12 Q. And so did you send him this Mexican tree
13 stand?
14 A. That, I did.
15 Q. All right. About when was that? Still in
16 August?
17 A. No, sir. It was prior to August. It
18 was -- oh, about August. June, July. In July.
19 Q. Did you sending Billy this -- this sample
20 tree stand precede your meeting with Cabela's where
21 they said "Do something," or did it happen after
22 that meeting?
23 A. Precede.
24 Q. Precede. Okay.
25     And so you sent the sample tree

1 me to send him a sample of the ladder to be able to
2 quote against the Mexican factory.
3 Q. Had you been buying some kind of product
4 from Billy Wong, CTI, prior to August of '99?
5 A. Yes.
6 Q. What?
7 A. Ground blinds.
8 Q. Okay. Anything else besides ground blinds?
9 A. Deer gambrels, steady shots, umbrellas.
10 Q. All right. Umbrellas as in?
11 A. Camouflaged umbrellas that were leftovers
12 from the material cut from the ground blinds instead
13 of throwing them away.
14 Q. All right. So is this something you just
15 put on the tree stand to keep the sun --
16 A. No.
17 Q. -- off of you?
18 A. Umbrellas to put in your glove compartment.
19 Q. Oh, a real umbrella?
20 A. A real camouflaged umbrella.
21 Q. Okay.
22     MR. PRINS: You're getting too
23 technical all of a sudden.
24 Q. (By Mr. Sanders) So anyway, we're -- we're
25 still back in August of 1999. You've had your

1 stand to Billy. And then you had this meeting with
2 Cabela's where they said "Do something"?
3 A. Correct.
4 Q. Tell me, did you have a conversation with
5 Billy Wong after that?
6 A. Correct.
7 Q. And was that in August?
8 A. Same day.
9 Q. Same day?
10 A. Same day.
11 Q. From Nebraska or were you back in
12 San Antonio?
13 A. I was in Nebraska calling them from my
14 mobile cell phone.
15 Q. All right. And what did you say to him?
16 A. "Billy, where is that ladder stand that you
17 basically have made?"
18     He said, "The sample should be at
19 your door" when I get back.
20 Q. Okay. And so you got back to San Antonio?
21 A. That, I did.
22 Q. Was there a sample ladder stand?
23 A. That, there was. That, there was.
24 Q. Okay. And was the ladder stand all in one
25 piece? Was it -- had to be assembled?

1   A.  It's exactly in Exhibit 5-A (indicating).
2   Q.  Exhibit 5 (indicating)?
3   A.  Yes.
4   Q.  Okay.  So did that ladder stand that Billy
5   sent to you -- and that was waiting for you when you
6   got back from Nebraska in August of '99?
7   A.  Yes, sir.
8   Q.  Now that ladder stand had to be assembled
9   you said?
10  A.  Correct.
11  Q.  Did it have assembly instructions?
12  A.  No, it did not.
13  Q.  So it was just a bunch of pieces in a box?
14  A.  Correct.
15  Q.  Okay.  If we were to look at the various
16  pieces in Exhibit 5 --
17  A.  Yes, sir.
18  Q.  -- were those the pieces that were in the
19  box (indicating)?
20  A.  Yes, sir.
21  Q.  So, in other words, they -- it did not have
22  a webbing -- webbing --
23  A.  Two 12-foot webbings.
24  Q.  It did not have two 12-foot webbings.  It
25  did not have two steel braces.  Instead, it had

1   these cables?
2   A.  Correct.
3   Q.  Okay.  And was that like then what you were
4   getting in Mexico except that it was in
5   assembleable -- assembleable pieces?
6   A.  Correct.
7   Q.  Okay.  So it was -- As best you could tell,
8   was it exactly like the Mexican one except you had
9   to assemble the pieces when Billy sent it to you?
10  A.  Correct.
11  Q.  Had you talked with Billy in advance about
12  having one that was, as you call it, a KD, a
13  knockdown?
14  A.  No, sir.  They took it upon their own.
15  Q.  Okay.  What did you do when you got back
16  and you found this sample in pieces?
17  A.  I assembled it.
18  Q.  Trial and error or did it -- was it pretty
19  simple to just look at and put together?
20  A.  It was simple to put together.
21  Q.  Okay.
22  A.  I assembled it.  I put it up on the
23  telephone pole out in front of the office, strapped
24  it in, climbed up on it, put a load test to it, and
25  then I put it back in the box the same day and I

1   sent it to Tom Gallagher overnight.
2   Q.  All right.  You said you put a load test to
3   it.  Explain what you mean.
4   A.  I -- Once the ladder is up on the tree, we
5   put a steel plate up on top of the foot platform and
6   the seat platform and you add a straight direct pull
7   down on the -- on the ladder and made it -- and we
8   put 450 pounds of weight on it.
9           The ladder didn't crimple or flex
10  or anything, so I sent it to Cabela's.
11  Q.  Okay.
12  A.  It meets -- It meets the same strength
13  requirements of the other.
14  Q.  All right.  That's what I'm trying to get
15  at.  I'm not too articulate about it, but we'll get
16  there.  Okay?
17  A.  Okay.
18  Q.  So the point being then, this is the same
19  kind of load test you had put on the Mexican stand
20  to make sure that they were --
21  A.  Correct.
22  Q.  -- equivalent, correct?
23  A.  Correct.
24  Q.  And they were?
25  A.  They were.

1   Q.  Okay.  And having satisfied yourself with
2   that, you put everything back in the box and sent it
3   to Gallagher?
4   A.  Yes, sir.
5   Q.  Okay.  And did you hear back from
6   Gallagher?
7   A.  Immediately.
8   Q.  All right.  What did Mr. Gallagher say?
9   A.  "They love it."
10  Q.  All right.  Did he tell you if they'd done
11  any kind of testing or anything else?
12  A.  At that point, no.
13  Q.  So they love it.  What else?  Anything
14  more?
15  A.  "Can you meet our orders?"
16  Q.  And those orders were the additional 30,000
17  within 90 days?
18  A.  Correct.
19  Q.  All right.  What did you tell him?
20  A.  I said, "Tom, you have to give me some
21  time.  I have to correspond with Billy Wong, ask him
22  if the factory is capable of building these ladders
23  in the time period and how you want to handle -- Do
24  you want to pick it up in China or do you want them
25  delivered to your door?"

1    Q.   And what did he say?
2    A.   He said, "We want them delivered to our
3    door," and that's it.  "Get them done."
4          So I talked to Mr. Wong.  Mr. Wong
5    told me he would get back to me the following day
6    because at that time of the day it was night and
7    everybody was asleep and he was going to be talking
8    to his -- his brother-in-law, RayLyn, the company
9    they had formed over there.
10         And they came back to me and said,
11   "Not only will we get them to you, all of them, all
12   your orders, in 90 days, we will beat that 90 days
13   in order to get -- to get the business."
14   Q.   Okay.
15   A.   "To make you shine."
16   Q.   When you got that sample box from the point
17   it was waiting for you --
18   A.   Yes.
19   Q.   -- when you got back to San Antonio, was
20   there any kind of, you know, letter, correspondence,
21   anything with it?
22   A.   No.
23   Q.   Had you gotten any e-mail about it?
24   A.   At that time -- I don't think we were on
25   e-mail at that time.

1    Q.   Okay.  So basically this was all a verbal
2    conversation with Billy?
3    A.   Correct.
4    Q.   All right.  When you had gotten word back
5    from Gallagher, "Yeah, we love it.  See if you can
6    get them on time," did you have any kind of written
7    communication with Billy Wong saying, "Can you meet
8    this order," whatever?
9    A.   No.  It was all verbal.
10   Q.   Okay.  Now, obviously since this required
11   assembly, there had to be assembly instructions,
12   correct?
13   A.   Correct.
14   Q.   And you're telling me then that Exhibit 5
15   was the assembly instructions that came about for
16   this ladder (indicating)?
17   A.   Correct.
18   Q.   How did they come about?
19   A.   I took them to a draftsman that did the
20   modifications.
21   Q.   You said "took them."  Took what?
22   A.   Took the instructions from the original
23   BBK, which was almost verbatim other than this, than
24   having these parts all in one piece (indicating).
25         Instead of having, you know, A, B,

1    C, D, all the way to G, we might have just had E
2    because there was no additional parts that we have
3    to exhibit in this that were on the original
4    instructions because they were all welded in one
5    piece (indicating).
6    Q.   Okay.
7    A.   So we made the modifications on the
8    instructions from the original BBK instructions.  We
9    forwarded them to Cabela's.  They approved them.
10   They looked them over.  And we forwarded them to
11   Billy Wong.
12   Q.   Okay.  Again, let's break it into pieces
13   and make sure I understand.
14         So you take the instructions that
15   were being used for the Mexican tree stand --
16   A.   Correct.
17   Q.   -- and you modified them in what you felt
18   was the appropriate way?
19   A.   Correct.
20   Q.   And what I want to get an understanding of
21   is between you and this draftsman that you were
22   talking about, what did you do and what did the
23   draftsman do?
24   A.   Well, I basically brought him the parts and
25   laid it out and brought him the ladder and he drew

1    out the parts for the ladder and the instructions
2    that were modified from the Mexican factory to the
3    China factory.
4    Q.   Okay.  Who was the draftsman by the way?
5    A.   It's been so long ago, I do not know his
6    name --
7    Q.   Do you still --
8    A.   -- and whether or not if he's in business
9    still today.
10   Q.   Do you have any kind of documents,
11   paperwork, anything in your records that would
12   identify who that draftsman is?  It could be
13   correspondence.  It could be a bill from him.  It
14   could be a payment to him.
15   A.   It could be a payment.  We'd have to go
16   back and look in files.
17   Q.   All right.
18         MR. SANDERS:  Do I need to make a
19   formal request, Todd, or will you --
20         MR. PRINS:  No.  I'll agree.  We'll
21   take a look, see if we can find that.
22         THE WITNESS:  Yeah.  He's -- I'll
23   try to find him, see if he's --
24         MR. PRINS:  Is he here in town?
25         THE WITNESS:  Yeah.  He's -- Last

1   time he was over off of Josephine Street.
2        MR. PRINS: Okay. Yeah. We'll see
3   what we can find out.
4        MR. SANDERS: Okay. So -- And so
5   it's clear, what I'd like is a name and any
6   communications with him, including drafts back and
7   forth, anything like that.
8        Q.  (By Mr. Sanders) So you go to the
9   draftsman. You'd say, "Here are the instructions we
10  were using and here are the parts for this one that
11  has to be assembled"?
12       A.  Correct.
13       Q.  That's the starting point, correct?
14       A.  Correct.
15       Q.  He did the drawings that we see in
16  Exhibit 5 (indicating)?
17       A.  He did, yes.
18       Q.  Now, were some of the drawings in Exhibit 5
19  merely the same thing that had been in your original
20  instructions (indicating)?
21       A.  Correct.
22       Q.  So, for instance, if we look on the
23  right-hand side of the page where it's showing
24  putting a ladder against a tree, for instance, were
25  those part of the original drawings?

1        A.  That was part of the original drawings.
2        Q.  Okay. And the part that he would have
3   drawn then would be the part where it shows putting
4   pieces of a ladder together?
5        A.  Correct.
6        Q.  Okay. And then the actual wording as
7   opposed to the pictures or the drawing, did you do
8   all the wording or did the draftsman do part of the
9   wording?
10       A.  I did the wording.
11       Q.  All right. So this collaborative effort
12  then was the draftsman doing drawings of parts and
13  you are doing any changes in wording that needed to
14  be made from the original instructions?
15       A.  Correct.
16       Q.  Okay. And when you got it done, your
17  collaborative effort done, you sent that to
18  Gallagher?
19       A.  Yes, sir, I did.
20       Q.  And tell me what communication, if any, you
21  received in response from Gallagher.
22       A.  I called -- I called him up because a lot
23  of it at that time was verbal and spoke with Tom,
24  asked him if he received the instructions, and he
25  said he did.

1             And I said, "Is there any
2   modifications that need to be done?"
3             And he said, "No. Everything is
4   fine. Go for it."
5        Q.  Okay. When you sent them to him, was there
6   any kind of cover letter or note?
7        A.  Might have been in a -- No. I mean just
8   "Tom, here's your instructions for the 15-foot
9   ladder," put them in an envelope and sent them on up
10  there.
11       Q.  All right. Do you have any copy of any
12  letter, note, any communication you had with
13  Gallagher forwarding those instructions to him?
14       A.  None. No, sir.
15       Q.  How did you get word back from him they're
16  okay?
17       A.  Verbal.
18       Q.  No note, no letter, no fax, nothing back to
19  you from him?
20       A.  Not that I -- Not that I know of at that
21  time, no.
22       Q.  Okay. Now, the -- So -- So now you've
23  gotten the instructions done and you've already
24  placed your order, I take it, with CTI for these
25  extra 30,000 ladders?

1        A.  Correct.
2        Q.  Okay. Did you send the instructions off to
3   Mr. Wong?
4        A.  Yes, I did.
5        Q.  And did you send them with a cover letter
6   or a fax or a note or any -- any form of written
7   communication?
8        A.  I believe I sent it to him in a letter -- I
9   mean in an envelope, you know, straight to his
10  address, "Here's the instructions," same as I did
11  Tom.
12       Q.  Okay. So do you have then a copy of the
13  note or the letter or whatever you put with the
14  instructions when you sent them to Billy?
15       A.  He should have them.
16       Q.  No. I'm asking if you have them.
17       A.  No, I do not.
18       Q.  At some point CTI started shipping these
19  directly to Cabela's?
20       A.  Correct.
21       Q.  Were the instructions included in the box?
22       A.  Yes, sir.
23       Q.  Did you ask at any time for one box with a
24  ladder and instructions to be sent to you so that
25  you could check out what was going to Cabela's?

1   A.   Not at that time.
2   Q.   Well, at some time did you?
3   A.   Not at that year. Not at all. Because
4   they were --
5   Q.   Not in 1999?
6   A.   I don't receive -- I didn't receive any
7   product from production. We sent samples over and
8   the instructions went over there in one piece; and,
9   no, I did not.
10  Q.   Okay. So in 1999 you did not receive any
11  sample of what was actually being shipped from CTI
12  to Cabela's?
13  A.   No. But we went over to the factory in
14  China, Tom and I and Doug Zingula, and viewed the
15  factory.
16  Q.   Okay. We're going to get to that. So
17  since you mention it, when was it that you went
18  to --
19  A.   After production.
20  Q.   Okay. But time-wise, was it in '99?
21  A.   No. I believe it was at the beginning of
22  2000.
23  Q.   Okay. So before production for the 2000
24  sales year started?
25  A.   Yes.

1   Q.   Okay. And you went to the factory; Billy
2   Wong was there also?
3   A.   Yes.
4   Q.   Did you identify any problems with the
5   product that was being produced?
6   A.   At that time, no.
7   Q.   Did you inspect any of the product being
8   produced while you were there?
9   A.   Yes.
10  Q.   Okay. And everything met with your
11  satisfaction?
12  A.   Correct.
13  Q.   Any -- Any kind of -- I forget what you
14  called it -- a load test or something?
15  A.   Yes. They all --
16  Q.   Did you do that there?
17  A.   They do that. We didn't actually view it,
18  but they had done it, a load test, and we also bring
19  the ladder stands in and have them tested at an
20  independent testing firm at that point.
21  Q.   All right. That's that Scientific Testing
22  Lab, I think it's called?
23  A.   Yes, sir.
24  Q.   Okay. Did you have anything to do with
25  that, or was that all Cabela's?

1   A.   I -- Cabela's. They paid for everything.
2   Q.   Okay.
3        MR. PRINS: Why don't we take five
4   here.
5        MR. SANDERS: Sure.
6        MR. PRINS: Seems like a good spot.
7        MR. SANDERS: No problem.
8        (Recess taken.)
9   Q.   (By Mr. Sanders) Okay. These 15-foot
10  ladder stands that we've been talking about, isn't
11  it correct that you actually designed that 15-foot
12  ladder stand yourself?
13  A.   No, sir.
14  Q.   Didn't you take the Wahoo product that was
15  on the market and redesign it yourself?
16  A.   Yes, sir. At the -- At the factory,
17  Mexican factory.
18  Q.   All right. So you did take the Wahoo
19  product --
20  A.   Modified it.
21  Q.   -- and you redesigned it, didn't you?
22  A.   Correct.
23  Q.   And the Chinese -- Once you started dealing
24  with CTI, that Chinese company -- that Chinese
25  factory they were coming from, you actually got

1   sample product in from time to time and tested it,
2   didn't you?
3   A.   Yes, I did.
4   Q.   All right. And did you set up a quality
5   assurance program at the factory in China?
6   A.   That, we did.
7   Q.   And you had the welded parts checked and
8   tested there, didn't you?
9   A.   Yes, sir.
10  Q.   You'd open up boxes and inspect them just
11  to make sure that everything was right?
12  A.   Yes, sir.
13  Q.   The quality control people in China, those
14  were ones that you made sure were there and doing
15  their job, right?
16  A.   They were there when I was there with Billy
17  Wong.
18  Q.   Okay. Now, I think where we were at was in
19  late '99 and how we -- how you started getting
20  product from the Chinese factory and how Exhibit 5
21  came about.
22       Now, in the year 2000, I think you
23  said, you went from these cables that we see in
24  Exhibit 5 to the two 12-foot webbings and the two
25  steel braces, right (indicating)?

1    A.  Correct.
2    Q.  How did it come about that you made those
3 changes in the design?
4    A.  The factory, on building the cables and
5 doing the crimps -- the facility was not doing a
6 quality control program.  So for safety measures, we
7 decided to go to the solid bar which would not allow
8 the -- the ladder to fold (indicating).
9           With the cables, this foot plate
10 would fold up and down, and over time we all felt
11 that it could cause -- could break, it could fail.
12 So by putting the -- the metal bars, it was a solid
13 fix, similar to the Wahoo ladder (indicating).
14    Q.  So were you going back to what the Wahoo
15 had been?
16    A.  Yes.  But instead of being welded, it was
17 bolted.
18    Q.  Now, when you said "We were concerned," I
19 want to know who the "we" is.
20    A.  Cabela's and I.
21    Q.  All right.  So these -- this change from
22 the cable to the steel braces, that was a joint
23 decision with Cabela's?
24    A.  Yes.
25    Q.  And are we talking about Gallagher again or

1 someone else?
2    A.  Gallagher and Doug Zingula.
3    Q.  All right.  Were there actual face-to-face
4 meetings with -- meeting or meetings with them on
5 this subject?
6    A.  Yes.
7    Q.  About when did those take place?
8    A.  In the 2000 period.
9    Q.  All right.  First half of the year?
10    A.  First, yes.
11    Q.  First quarter maybe?
12    A.  First quarter.  It was I believe on the
13 first visit to the factory.
14    Q.  To the factory in China?
15    A.  Correct.
16    Q.  Okay.  So that -- that design change was at
17 least first discussed during the visit to the
18 Chinese factory?
19    A.  Yes.
20    Q.  Was it decided upon there or did the
21 decision come later?
22    A.  I believe the decision was made there.
23    Q.  Okay.  And this was a design change then
24 that basically you and Zingula and Gallagher agreed
25 to and told the people at the factory, "Here's what

1 we want to do differently"?
2    A.  We told Mr. Wong.
3    Q.  Now, eventually, I take it, that ladders
4 were produced with these changes?
5    A.  Correct.
6    Q.  Did you do any testing?
7    A.  We did testing at the facility.
8    Q.  Which facility?
9    A.  China.
10    Q.  Well, were you there long enough that they
11 actually started making these braces while you were
12 there?
13    A.  No.
14    Q.  Okay.  Then let me make sure my question is
15 clear.
16           Once you started -- Once the
17 factory started building product with these braces
18 rather than the cables, did you do testing on the
19 product with the braces?
20    A.  No.
21    Q.  So part of this quality control program
22 at -- that you had going at the Chinese factory did
23 not include testing of -- load testing then?
24    A.  Well, we knew automatically that the steel
25 bars were 10 times stronger than the steel cable and

1 had no -- no place to where it would slip out of the
2 cable.
3    Q.  All right.  So you felt that the testing
4 wouldn't be necessary --
5    A.  No.
6    Q.  -- load testing wouldn't be necessary then?
7    A.  We improved the product.
8    Q.  Okay.  The webbing straps -- Were webbing
9 straps included back in -- in '99?
10    A.  No.
11    Q.  All right.  But they became an item that
12 was included in 2000?
13    A.  Correct.
14    Q.  What was the decision on why to add them?
15    A.  Just keeping the ladder stable.
16    Q.  All right.  Whose idea was that?
17    A.  That -- That idea came from Tom Gallagher
18 and I attending the TMA meetings at the TMA shows
19 and hearing the other tree stand manufacturers
20 saying there's a need for safety cross straps.  We
21 both elected that -- to put them in, get them in.
22    Q.  Okay.  Was this also during the first
23 quarter of 2000 or did that happen later?
24    A.  That pretty much all happened at the same
25 time of the -- of the steel bars.

1    Q.   Okay.   Now, we know then that Exhibit 4
2    came about because we have now added the steel
3    braces and the webbings.
4    A.   Correct.
5    Q.   You have to put them in since they're now
6    in the box, right?
7    A.   Correct.
8    Q.   Okay.   And you've got an illustration on
9    there of what the steel braces look like so that
10   somebody understands what an Item I is?
11   A.   Correct.
12   Q.   Okay.   Did you go to the same draftsman to
13   draw that illustration?
14   A.   Yes, sir, I did.
15   Q.   The same guy whose name we're going to
16   find?
17   A.   We're going to try to do our best.
18   Q.   Okay.   As far as the wording, did you
19   change any wording because of the addition of the
20   webbing straps and the steel braces?
21   A.   That, we did.
22   Q.   Okay.   What wording did you change?
23   A.   I believe -- Well, I believe we added the
24   metal straps and putting in there the 12-foot
25   webbing.   That's the only thing.   But throughout, I

1    believe everything stayed pretty much the same other
2    than adding the parts to it --
3    Q.   Okay.
4    A.   -- and the wording for the parts.
5    Q.   Okay.   And the wording for the parts -- I
6    mean, obviously we see the H and the I and the
7    wording that tells the parts (indicating).
8    A.   Correct.
9    Q.   Okay.   And since I'm looking at it upside
10   down, are there anything in here that talks
11   specifically about what to do with the steel braces?
12   A.   No, it does not.
13   Q.   All right.   Is there anything in here
14   specifically that tells you what to do with the
15   webbing straps?
16   A.   No, it does not, other than the photo.
17   Q.   Okay.   Why did you elect to not put wording
18   in about the steel braces?
19   A.   At that point I couldn't answer that.
20   Q.   Why did you elect not to put any wording in
21   about the 12-foot webbings?
22   A.   At that point it was just get it in and the
23   wording didn't get up with the -- we just didn't do
24   the wording in time --
25   Q.   Okay.

1    A.   -- follow-up.
2    Q.   Okay.   Now, where is the picture for the
3    webbing?   And if it's on the other page, feel free
4    to --
5    A.   Well, you have webbing here in Item 4
6    (indicating).   You have webbing here in the back of
7    the -- for helpful hints (indicating).   And you have
8    the webbing shown exclusively on the front
9    instructions (indicating).
10   Q.   Okay.   Now, if we -- if we are to look at
11   Exhibit 4, we'll call the front page the one that
12   has the exhibit sticker 4 on it and it says BBK-117
13   (indicating).
14   A.   Uh-huh.
15   Q.   So on that page, on the left-hand side of
16   the page, there's a picture of a tree, and you're --
17   you're telling me there's two -- there's webbing
18   straps shown there (indicating)?
19   A.   Correct.
20   Q.   And then on the right-hand side of the
21   page, there's a bigger picture of a tree and there's
22   webbing straps shown, correct (indicating)?
23   A.   Correct.
24   Q.   And then on the second page of Exhibit 4,
25   the right-hand side, the upper left-hand corner of

1    the right-hand half of the page, there's another
2    picture of a tree with webbing (indicating)?
3    A.   Correct.
4    Q.   All right.   Now, is that -- the pictures
5    then that we've just identified as showing the
6    webbing, is that the way the webbing strap is
7    supposed to go on?
8    A.   Exactly.
9    Q.   Now, that -- I may be showing my ignorance
10   here, but is that one strap or two straps that's
11   shown (indicating)?
12   A.   That's two straps.   It goes on one corner,
13   wraps around, ties to this one.   This one goes
14   around the tree and ties onto that one (indicating).
15   Q.   Okay.   So the picture then actually depicts
16   two webbing straps.   And if we look at the front
17   page, the bigger tree, we see, oh, halfway down the
18   ladder there's a strap on each side of the ladder
19   (indicating)?
20   A.   Correct.
21   Q.   If we look up near where the seat is, then
22   we see -- can see at least on one side a webbing
23   strap going up around the seat (indicating)?
24   A.   Correct.
25   Q.   All right.   And so that's the -- that's the

22 (Pages 82 to 85)

1  visual depiction that you were intending to make
2  for --
3      A.  For the two --
4      Q.  -- for the two straps?
5      A.  Correct.
6      Q.  Okay.  So that I'm clear then, the
7  illustra -- the draftsman, really, what he would
8  have done for his part of Exhibit 4 is, first of
9  all, he would have had to have drawn the picture,
10 Item I, of the steel braces, right (indicating)?
11     A.  Correct.
12     Q.  And he would have added the webbing straps
13 in the different places that we've talked about
14 showing webbing straps (indicating)?
15     A.  Correct.
16     Q.  Did he do anything beyond those items?
17     A.  No, not that I believe.  Those are the only
18 two changes that we did.
19     Q.  All right.  And then the wording, any
20 wording changes, you took care of?
21     A.  Yes, sir, I did.
22     Q.  Did you kind of give him a copy of
23 Exhibit 5, the old one, and tell him, "Here's what
24 you need to change for this new one" (indicating)?
25     A.  Yes.

1      Q.  And did you have the old one in front of
2  you that you made the changes on for the new one
3  (indicating)?
4      A.  Basically.  I told him that we needed to
5  add -- I laid the parts out.  Actually, I took the
6  parts to him in a box.
7      Q.  Okay.  Now, as you were doing that --
8  giving things to the draftsman and doing your own
9  work, did you take a copy of -- then of the
10 instructions that were in use and give him -- excuse
11 me -- give him that one to work from?
12     A.  I don't believe I did.  I believe he worked
13 off his own file.
14     Q.  Did he keep one, you think, then?
15     A.  I think so.  If -- If he still has it.  It
16 was in '98 and '99.  That's quite some time ago.
17     Q.  All right.
18         MR. SANDERS:  And if he has a file,
19 we'd like to get a copy.
20         MR. PRINS:  I would assume if he
21 has one, he'll give it up to me without any fight.
22         MR. SANDERS:  Well, if he doesn't
23 want to, then just tell us and we'll take care of
24 it.
25         MR. PRINS:  We'll go from there.

1          I was also going to tell you, too,
2  in regard to the entity, I don't know that there was
3  any request specifically for this, but I can obtain
4  the filings with the Texas Secretary of State's
5  office and provide those to you showing the -- the
6  creation dates of Limited and Inc.
7          MR. SANDERS:  I think we probably
8  have them already.
9          MR. PRINS:  I think you might.  But
10 if you don't, let me know.
11         MS. POWERS:  I would like you to
12 provide those documents, anything you have, so...
13         MR. PRINS:  Okay.  I'll get a copy
14 of them and send them out then.
15     Q.  (By Mr. Sanders)  Once -- Once the draftsman
16 got done with his part of the assignment to create
17 Exhibit 4, did he -- I assume he gave that back to
18 you, right?
19     A.  (Witness nods head up and down.)
20     Q.  That's a "yes"?
21     A.  Yes, sir.  Sorry.
22     Q.  It doesn't bother me, but it's hard for
23 her.
24     A.  I understand.
25     Q.  And then you added your part?

1      A.  Yes.
2      Q.  Okay.  What did you do after that?
3      A.  Sent it to Tom Gallagher.
4      Q.  And what happened after that?
5      A.  He approved it and we sent it over to CTI.
6      Q.  Okay.  Did -- After that did you ever -- as
7  you continued to get parts -- Well, let me start
8  over so it makes sense.
9          After you got into production for
10 the 2000 year --
11     A.  Yes.
12     Q.  -- with this new design, okay, did -- did
13 you get samples of those in so that you could see if
14 they were, in fact, being built the way you told
15 them you now wanted them built?
16     A.  At that point I don't -- I cannot remember
17 honestly to answer that correctly.
18     Q.  Okay.  Had it been your intent at least to
19 do that?
20     A.  Yes.
21     Q.  Okay.  And knowing how you operated your
22 business, would you assume that if it was your
23 intent to do that, that you probably followed
24 through on it?
25     A.  Yes, I did.

1    Q.  Okay.  And when you did that, did you
2    know -- did you look through those instructions?
3       A.  At that point I don't believe I did because
4    we were just looking -- we did not know we had any
5    issues with the instructions, so we followed up with
6    the tree stands, making sure that the safety cross
7    strap's in it.  And I guess I'm -- I might have
8    overlooked that or I cannot answer that correctly.
9       Q.  All right.  At some point in time did you
10   ever look at instructions, either Exhibit 5 or
11   Exhibit 4, and determine that there was a numbering
12   of 1, 2 and 7?
13      A.  That came from Cabela's notifying me that
14   we had a problem with the instructions.  Customers
15   were calling and saying, "Hey, you have a typo."
16      Q.  When did that happen?
17      A.  Sometime in 2000.
18      Q.  All right.  So sometime in the year 2000 --
19   let's try and break it down by quarter again if we
20   can.  Do you remember what quarter of the year?
21      A.  It would have been in the first part of the
22   year after the corrections were made on this and the
23   other stands were being out the door (indicating).
24      Q.  Okay.
25      A.  We really --

1       Q.  You were pointing one direction --
2       A.  Okay.
3       Q.  -- but she doesn't get that, so...
4       A.  Okay.  The exhibit -- if I'm not mistaken,
5    this is Exhibit --
6       Q.  That's 4.
7       A.  -- 4 (indicating).  And -- And this is
8    Exhibit 5 (indicating).
9            The -- I do not believe Exhibit 5,
10   any of the instructions with the typo, were ever
11   brought to us at the time --
12      Q.  Okay.
13      A.  -- of having a problem (indicating).
14           In the year 2000, we started
15   getting calls that the instructions had a typo.  So
16   at that point I believe that we did another
17   instructions for 2001, which is not here at this
18   time.
19           And it was all -- I believe it was
20   done by Cabela's and given to me and sent to CTI
21   because of that one issue of the -- making -- we
22   were -- every year we were doing more and more
23   improvements to instructions, verbiage, everything.
24      Q.  Okay.  So let's -- Again, we'll break that
25   down into pieces so we got it clear.

1            Sometime in the year 2000 -- and
2    we'll try and narrow it down in a moment, but
3    sometime during the year 2000, did BBK receive any
4    calls about a typo in the instructions?
5       A.  That, I did.
6       Q.  All right.  About how many calls did you
7    get?
8       A.  No more than four or five.
9       Q.  Okay.  And were these on ladders that had
10   been sold under the Cabela's name or ladders that
11   were sold under the BBK name?
12      A.  Under the Cabela's name.
13      Q.  All right.  And basically people would just
14   call and say, "Hey, you got a typo in your
15   instructions"?
16      A.  Correct.
17      Q.  Okay.  And to your knowledge, did Cabela's
18   get any calls like that in the year 2000?
19      A.  I believe their customer service did say
20   it.  And we went -- they went and checked the
21   instructions themselves, and that's where Tom says,
22   "I -- We've got a -- We've got an issue with the
23   instructions.  It's a typo.  But we need to -- we
24   need to watch this from here on out."
25      Q.  Okay.  So basically Gallagher told you --

1       A.  Right.
2       Q.  -- that somebody from customer service in
3    Cabela's had received some calls saying -- from
4    customers saying, "There's a typo in the
5    instructions"?
6       A.  Correct.
7       Q.  All right.  And would this have been --
8    have been -- these calls have been spread across the
9    year 2000 at various points in time?
10      A.  Yes.
11      Q.  Okay.  Did Mr. Gallagher tell you that he
12   was taking any action about that independent of
13   calling you and telling you about it?
14      A.  No.
15      Q.  Did you take any action in response?
16      A.  Yes.  I called Billy and said, "We've got
17   an issue with the instructions."  And by that point,
18   all -- all the production ladders, all the orders,
19   had been shipped.
20      Q.  For the year 2000?
21      A.  For the year 2000, correct.
22      Q.  Okay.
23      A.  The '99 had come in.  The -- Cabela's had
24   cut orders early for following year 2000.  We
25   continued to do with the instructions with the

1  modifications done to get ahead of the curve.
2       And then in the year 2000, we
3  started getting the issue on the -- on the typo.
4  And then I believe in 2001, they came out with their
5  own instructions, which is --
6     Q.  Okay.  Let's take those a piece at a time
7  then.
8       So we know that the -- the tree
9  stand that had the webbing strap and the steel
10  brace, that new design, those probably started
11  shipping from the factory to Cabela's in, what,
12  June-July of 2000?
13     A.  Yes.
14     Q.  All right.  And those came with an
15  instruction sheet that had the typo?
16     A.  Correct.
17     Q.  And you got calls and Cabela's, according
18  to Gallagher, got calls about that typo?
19     A.  Correct.
20     Q.  And so sometime after that, during the year
21  2000, you called Billy and said, "We got a typo
22  issue"?
23     A.  Correct.
24     Q.  Okay.  Nothing in writing with Billy.  That
25  was a phone call?

1     A.  That was a phone call.
2     Q.  All right.  And did Billy tell you, "We'll
3  take care of that"?
4     A.  Yes.
5     Q.  All right.  And so now we're into -- now
6  we're going to get into the year 2001.
7     A.  Correct.
8     Q.  Okay.  And production is going to start
9  sometime in 2001 for delivery in June or July of
10  2001?
11     A.  Correct.
12     Q.  Did you ever check the instructions that
13  came with the ones that were for delivery in June or
14  July of 2001?
15     A.  I believe we did.
16     Q.  And were -- was that typo corrected?
17     A.  Correct.  It was in a different instruction
18  manual.
19     Q.  Okay.  Let's stop there for a minute
20  because I remember you did say something.
21       Other than a typo being corrected,
22  were the instructions that came out in 2001
23  different than what we see in Exhibit 4
24  (indicating)?
25     A.  Yes, sir.

1     Q.  All right.  I'm going to show you what has
2  been marked as Exhibit 6.  We know those came about
3  sometime, but I don't know that I have a time frame.
4       So I want to know is Exhibit 6 the
5  instructions that started being used in 2001 or did
6  those come later on?
7     A.  I believe these came in 2001.
8     Q.  Okay.  So it's your belief that for the
9  product that started shipping in the summer of 2001,
10  the instruction sheet in use was Exhibit 6
11  (indicating)?
12     A.  I'm sorry.  I was looking at this.
13     Q.  I'm sorry.
14     A.  What's the question?
15     Q.  You go ahead and look.  When you're done
16  looking, tell me.
17     A.  I was viewing this because I'm -- I'm --
18  I'm comparing the safety videotape and I'm trying to
19  figure out when --
20     Q.  Take your time.  That's fine.
21     A.  I believe we started this in -- in 2001.
22  Yes.  '99 (indicating).  2000 (indicating).  2001
23  (indicating).  And there's another one out there
24  somewhere.
25       MR. PRINS:  Why don't you do that

1  again.  Say exhibit numbers, Albert, real quick.
2       THE WITNESS:  This is Exhibit 6 in
3  2001 (indicating).  Exhibit --
4     Q.  (By Mr. Sanders) 4.
5     A.  -- 4 in 2000 (indicating).  Exhibit 5 in
6  '99 (indicating).
7     Q.  Okay.  Exhibit Number 6, who drafted it?
8     A.  Both Cabela's and I.
9     Q.  All right.  Were the illustrations done by
10  your draftsman?
11     A.  We took -- Actually, at this point digital
12  was coming to effect and we put digital pictures of
13  the ladder with the safety cross straps.  We showed
14  how -- the operation of the safety cross straps all
15  done on digital.
16       I believe the digital work was done
17  with my -- my assistant manager, Bob Kinder.  The
18  verbiage came between the -- Cabela's and ourself,
19  and then finally approved by Cabela's for production
20  and printing.
21     Q.  Okay.  I want to -- I'm going to come back
22  to some of these again in a minute, but I want to
23  switch to two separate different subjects.
24       Labeling on the product itself.
25  Was there any kind of labeling other than the name

1 Cabela's?
2   A.  Yes.
3   Q.  What?
4   A.  CTI model number.
5   Q.  Anything else?
6   A.  That's it.
7   Q.  Okay.  What one might call warnings.  Were
8 there any kind of warnings on the product itself?
9   A.  On the box.
10         MS. POWERS:  Just a minute.  During
11 what period of time are we talking about?
12   Q.  (By Mr. Sanders) Okay.  Let's go back.
13 Let's talk about labeling.
14         At any time from 1999, once CTI
15 started producing the product, up until 2004 when
16 you were no longer -- Was it 2004 when you stopped
17 buying product from CTI?
18   A.  Yes.  The beginning of 2004.
19   Q.  Okay.  During that entire time frame, was
20 there ever any labeling other than the name Cabela's
21 and the CTI model number on the product itself, on
22 the ladder itself?
23   A.  No.  Not that I -- On -- On the metal part?
24   Q.  On the metal parts.
25   A.  No.  I don't think there was any labeling

1 on it.
2   Q.  Okay.  On the box, was there any labeling
3 other than the name Cabela's and information about
4 Cabela's and the CTI model number?
5   A.  I believe it had some warning issues,
6 warning labels on the box.
7   Q.  Okay.  We're going to talk about warnings,
8 but labeling other than warnings.
9   A.  No, sir.
10   Q.  Now let's go to warnings.
11         On the metal, the stand itself,
12 between '99 and 2004, were there any warnings on the
13 metal or the stand?
14   A.  Yes.  There was a yellow warning label,
15 small.
16   Q.  That said?
17   A.  I believe -- I can't remember.  It's a
18 small label.
19   Q.  When did it first start appearing?
20   A.  At the very beginning.
21   Q.  At the very beginning?
22   A.  Yes, sir.
23   Q.  And who drafted the language that was on
24 that yellow warning label?
25   A.  We used it verbatim that came on the Wahoo

1 ladder.
2   Q.  All right.  So basically you took whatever
3 was on the Wahoo ladder and just said "We're going
4 to use the same warning label"?
5   A.  Correct.
6   Q.  And as we sit here today, you just don't
7 remember what that language was?
8   A.  No, sir, I don't.
9   Q.  Did it change -- Did that language change
10 at any time up through 2004 on the ladder itself?
11   A.  I believe at the -- on the ladder itself,
12 we started putting a bigger warning label, one piece
13 with a triangle warning, and don't do this, don't do
14 that.  There was a -- It's been a while, but I
15 believe there was a big white warning label on
16 them --
17   Q.  When did --
18   A.  -- at that point.
19   Q.  When did you start doing that?
20   A.  I want to say it was in 2003.
21   Q.  Okay.  And who wrote the language for that?
22   A.  I can't recall.
23   Q.  Well, do you recall, was it you or was it
24 Cabela's --
25   A.  I --

1   Q.  -- or was it both of you?
2   A.  I believe we took the warnings from the
3 instructions and put them on the label, these
4 warnings right here (indicating).
5   Q.  Okay.  Now, we're talking, first of all,
6 Exhibit Number 6, correct (indicating)?
7   A.  Correct.
8   Q.  And the first page -- Can you tell me what
9 portion of the first page of Exhibit 6 contains a
10 warning that you believe went on a label -- went on
11 the stand itself beginning in about 2003?
12   A.  If I'm not mistaken, it was these items
13 right here (indicating).
14   Q.  And there's Items 1 through 10?
15   A.  1 through 10.
16   Q.  And there's two number 10's?
17   A.  10's, correct.
18   Q.  Okay.  And you believe then that beginning
19 in approximately 2003, a warning label went on the
20 stand itself that contained each of those items
21 (indicating)?
22   A.  I believe.
23   Q.  And about what portion of the stand do you
24 think it went on?
25   A.  It either went on the front here or on the

1 ladder section (indicating).
2    Q. On a rail?
3    A. No. On the ladder. On the side -- On the
4 side bars. Not on the -- Not on the footrest. You
5 can say rail, yes.
6    Q. Yeah. On a side rail?
7    A. On the side rail.
8    Q. All right. So -- And what was the decision
9 as to why to do that?
10    A. Cabela's and I were trying to conform to
11 TMA, which is a -- an organization that was formed
12 to help inform tree stand manufacturers of upcoming
13 problems that are occurring in litigations for
14 informing and everything.
15    So we were just improving the
16 ladder and instructions and verbiage and putting a
17 safety warning -- I mean a safety video into it. We
18 were -- We were doing everything we could to inform
19 the public.
20    Q. Now, on the box that this came in, were
21 there any warnings placed?
22    A. I want to say yes, there was, but I can't
23 recall how much warnings there were on the box of
24 Cabela's Pine Ridge ladder.
25    Q. All right.

1    THE COURT REPORTER: Pine Ridge?
2    THE WITNESS: Pine Ridge. At that
3 time I believe they changed the name. They turned
4 it to a Pine Ridge label.
5    Q. (By Mr. Sanders) If I were to ask you what
6 the wording was, you wouldn't remember that today?
7    A. No, sir. Because I -- I didn't have my
8 hands on the box every day. I did not see it.
9    Q. Okay. Now, just so I can see where --
10 Earlier you had told me that you thought Exhibit 5
11 was 1999, Exhibit 4 was 2000, and Exhibit 6 was 2001
12 (indicating).
13    A. Correct.
14    Q. And I just want to see if, as you think
15 about this more, Mr. Gallagher believed that
16 Exhibit 6 didn't start until 2002. Is that a
17 possibility?
18    A. No. Because we started putting -- we
19 started putting the safety video, I believe, in
20 2001. In fact, that was myself, Cabela's was --
21 along with API were the first to start putting
22 safety videos in. And we were still allowed to put
23 cross strap -- I mean a chest harness in at that
24 time.
25    So in 2004 -- I want to say

1 Exhibit 6 was done in 2001 (indicating).
2    Q. Okay. And you are -- Are you kind of
3 basing that on when you think the video was first
4 used?
5    A. Correct.
6    Q. So if we were able to determine
7 independently somehow that the video didn't come
8 about until 2002, would that indicate then --
9    A. That this would be a 2002. But --
10    Q. Okay.
11    A. -- I've been putting videos in for three or
12 four years.
13    Q. Okay. So in any event, Exhibit 6 you're
14 putting 2001 on because of the video, and that's
15 basically the key element in your mind?
16    A. Correct.
17    Q. Okay.
18    MS. POWERS: Can we go off the
19 record for just a minute?
20    MR. SANDERS: Sure.
21    (Recess taken.)
22    Q. (By Mr. Sanders) All right. I want to ask
23 you briefly, design of the tree stand that was
24 manufactured by the Chinese plant.
25    Now you've told me the difference

1 is that it was -- the ladder part itself was in
2 pieces to be assembled as opposed to one --
3    A. No. You're wrong.
4    Q. No? Okay. Let's take it a piece at a time
5 then.
6    When you got them from the Mexico
7 factory, was the ladder all in one solid piece or
8 did you have to assemble those pieces?
9    A. You had to assemble the ladder.
10    Q. The ladder you had to assemble?
11    A. Correct.
12    Q. Okay.
13    A. The three sections you put in together.
14    Q. Okay. And then when you got the product
15 from Mexico where the -- you'll have to identify the
16 parts, but I see a part that has a footrest
17 (indicating)?
18    A. Correct.
19    Q. And then above the footrest is the seat
20 (indicating)?
21    A. Correct.
22    Q. The part that had the seat on it, was it
23 all one solid piece with the part that had the
24 footrest --
25    A. Correct.

1  Q. -- from Mexico?
2  A. Correct.
3  Q. So if we were looking at Exhibit 5, it
4  shows, for instance, a -- a curved piece of metal
5  that connects to the seat, and that in itself, that
6  curved piece of metal, goes onto the piece of metal
7  holding the footrest (indicating)?
8  A. That was all one piece.
9  Q. So that was all one piece coming from
10 Mexico (indicating)?
11 A. Correct.
12 Q. And so the difference from the Chinese
13 factory was -- was making those where you had to
14 assemble the footrest piece onto the seat piece
15 (indicating)?
16 A. Correct.
17    Item G in the parts list and the
18 contents of the box was modified by the Chinese to
19 be able to reduce the size of the box in half.
20 Q. All right. Other than that change, was
21 there any change between the -- what was made in
22 China and what was made in Mexico?
23 A. No.
24 Q. Okay. And is it fair to say that that
25 change you've just identified to me was a change

1  that you discussed in advance with Mr. Wong and
2  agreed to?
3  A. Correct.
4  Q. All right. And, in fact, I think you told
5  us you load tested it --
6  A. That, I did.
7  Q. -- after you got it.
8  A. That, I did.
9  Q. Okay. Now, I want to show you --
10    MR. SANDERS: Do you guys remember
11 what the last exhibit number was?
12    MS. POWERS: 7.
13    MR. SANDERS: So we would be on 8?
14    MS. POWERS: Uh-huh. I believe so.
15    MR. ZEIDLER: Yeah. That's what
16 I've got, too.
17    MR. SANDERS: Okay.
18 Q. (By Mr. Sanders) I'm going to show you what
19 we'll mark as Exhibit 8.
20    (Deposition Exhibit Number 8
21    (marked.)
22    MR. SANDERS: And for other
23 counsel -- I'm sorry. I didn't make extra copies,
24 but this is CTI 1 if you want to see what he's
25 doing.

1  Q. (By Mr. Sanders) I'm going to show you
2  Exhibit 8 and ask you to take a moment to look at
3  that. And when you're done looking, tell me and
4  then I'll ask you questions.
5  A. Okay. And your question pertaining?
6  Q. Yeah. The question is, first of all, do
7  you recognize this document?
8  A. Yes, I do.
9  Q. And is this an e-mail from you or from BBK
10 Enterprises, Inc., to Billy Wong?
11 A. Correct. It is.
12 Q. And it's dated July 14th of '99?
13 A. Correct.
14 Q. So I guess we were using e-mail back then.
15 A. Okay.
16 Q. Okay. And on here then there was a message
17 by e-mail from Billy to you?
18 A. Uh-huh.
19 Q. And what I want to understand -- There are
20 questions. And then in cap -- after each question,
21 there is something in capital letters that appears
22 to be an answer to the question.
23 A. Uh-huh.
24 Q. Do you see what I'm referring to
25 (indicating)?

1  A. Uh-huh.
2  Q. Are those things in capital letters your
3  response to the question?
4  A. I told him he could do the same as the
5  ladder that came from Mexico.
6  Q. Okay. But my -- just so that I understand
7  what this is, what I'm wanting to know is did Billy
8  send you an e-mail with these questions and what you
9  sent back was his e-mail with capital letter answers
10 next to his questions?
11 A. Yes.
12 Q. Okay. So that's how I would read that then
13 is that his question is in the smaller case and your
14 answer to the question is in all caps?
15 A. Correct.
16 Q. Okay. And when he -- when he had here,
17 "Are we going to make the connection parts of the
18 ladder same as Mexico or can we do the same as
19 sample we sent you," you answered, "You can do same
20 as sample sent."
21 A. Correct.
22 Q. That's -- That was when you were referring
23 to you got the sample and you told him this is fine
24 the way it is?
25 A. Right.

1    Q.   Okay.  Now, he says, "About the label, we
2  really need the negative of the print to make the
3  label.  Can you send us the negative?"
4         And you say, "We do not have
5  negative.  We just use business card."
6         What was that all about?
7    A.   That was for the Cabela's label that goes
8  on the box.  And basically they can just xerox
9  the -- the Cabela's label and blow it up and put it
10  on the box.  It was a black and white.
11   Q.   Okay.
12   A.   To make it simple.
13   Q.   Now, this was July of 1999, which is
14  consistent with the time frame you were telling me
15  you first started talking with Billy, right?
16   A.   Correct.
17   Q.   And then you told us about this meeting in
18  August where Cabela's said "We need more," right?
19   A.   Yes.
20   Q.   And you talked to Billy about "Can you meet
21  the demand" and all of that, right?
22   A.   Correct.
23   Q.   And then at some point after that, he told
24  you "yes," and you sent him the instructions that
25  were to be used, right?

1    A.   Correct.
2    Q.   And what I want to do is show you what
3  we'll mark as Exhibit 9.
4         (Deposition Exhibit Number 9
5         (marked.)
6    Q.   (By Mr. Sanders) And I should ask, back at
7  that point in time at least, did BBK have a
8  telephone number of (210) 590-4080?
9    A.   That's our fax.
10   Q.   That's your fax number back then.  Okay.
11  And Arla was your secretary?
12   A.   Correct.
13   Q.   So I'm going to show you Exhibit 9 then and
14  ask you if this is the fax that you sent to Billy
15  with the instructions?
16         And you can check the fax numbers
17  at the top of each page to confirm that.
18         MR. ZEIDLER:  Is this CTI 3, Steve?
19         MR. SANDERS:  It is.
20         MR. ZEIDLER:  Okay.
21         THE WITNESS:  I'm going to have to
22  say yes, it is.
23   Q.   (By Mr. Sanders) And you notice it says
24  numbers 1, 2 and 7, doesn't it, sir?
25   A.   Yes, it does.  But at this -- at this time

1  I'm going to hold my innocence because I know this
2  looks bad on my part, but at no given time did we
3  have 3 for 7.
4    Q.   Well, did you think that somebody perhaps
5  sent a sheet to Mr. Wong that had the numbers 1, 2
6  and 7 from your fax machine back in 1999?
7    A.   That's a possibility because it shows it
8  right here (indicating).
9    Q.   Right.
10         And that's -- might be an
11  explanation as to how Exhibit 5 and Exhibit 4 turned
12  out with numbers 1, 2 and 7, wouldn't it
13  (indicating)?
14   A.   Possible.
15   Q.   I next want to show you what we'll mark as
16  Exhibit 10.
17         (Deposition Exhibit Number 10
18         (marked.)
19   Q.   (By Mr. Sanders) There's a CTI number on
20  that.  Will you tell the counsel here what we're
21  looking at?
22   A.   CTI000066.
23         MR. PRINS:  66.
24   Q.   (By Mr. Sanders) Okay.  Take a moment to
25  look at that, sir.  And when you're done, my

1  question will be tell me what that is.
2    A.   This is kind of a modification to a stand
3  that Billy and I were working on for a cover over a
4  13-foot tripod.  And this was a -- a stand that
5  Cabela's had forwarded to me to get a quote on.
6         And the other page here shows of a
7  stand that -- that I was building at the time and
8  wanted to put a cover on my stand.
9    Q.   Do any of those have anything to do with
10  the 15-foot ladder stand that we're here about?
11   A.   The -- On Page 1 of Exhibit -- it's so
12  black I cannot -- I cannot --
13   Q.   It's not a good copy, I agree with that.
14   A.   It's not a good copy.
15         Page 2 on the Exhibit 067 doesn't
16  pertain to the ladder.
17         The only thing that pertains to
18  the -- on Page 3 of the exhibit is the buckles
19  that -- No.  I take that back.  The buckles were for
20  the SS Lounger.
21         And on the back page, it's
22  basically the tripod that we have for BBK.  And I
23  really can't tell you what the bottom right-hand
24  corner of the first page is, but this has nothing to
25  deal with the ladder stand in question.

1    Q.   All right.  The next thing is Exhibit 11.
2            MR. SANDERS:  And, Counsel, this is
3    CTI 25.
4            (Deposition Exhibit Number 11
5            (marked.)
6    Q.   (By Mr. Sanders) And, again, after you've
7    looked through it, my question is -- the first
8    question will be does this have anything to do with
9    the 15-foot ladder stand that we've been talking
10   about?
11   A.   No, it does not.
12   Q.   I'm not going to bother to mark this yet
13   just in case it has nothing to do with the 15 foot.
14   It's CTI 28 through CTI 44.
15           Can you look through this and tell
16   me if this has anything to do with the 15 foot?  If
17   it does not, then we'll be done with it.
18   A.   No, it does not.
19   Q.   Okay.
20   A.   Let me go through this and make sure.  This
21   is the SS Lounger.
22   Q.   The actual 15-foot ladder that's the
23   subject of this lawsuit, the one that Mr. Gray fell
24   from --
25   A.   Yes.

1    Q.   -- have you had a chance to see it in
2    person?
3    A.   No, sir, I have not.
4    Q.   Okay.  So when there was an inspection of
5    it, you did not attend that inspection?
6    A.   No, sir, I did not.
7    Q.   All right.  Did anyone attend on your
8    behalf other than perhaps your attorney?
9    A.   Yes.  I believe so.
10           MR. PRINS:  Our lawyer up there,
11   Alan.  Alan did.
12           MR. SANDERS:  Okay.  I knew Alan
13   did.  But I'm wondering did any --
14           MR. PRINS:  No.
15           MR. SANDERS:  -- anybody other than
16   a lawyer?
17           MR. PRINS:  No other
18   representatives of BBK.
19           THE WITNESS:  There was --
20   Q.   (By Mr. Sanders) People from Cabela's, I
21   know.
22           MR. PRINS:  Cabela's expert.
23           THE WITNESS:  Cabela's expert.
24   Correct.
25           MR. SANDERS:  Right.

1    Q.   (By Mr. Sanders) Okay.  Other than
2    information from your lawyer -- because I don't want
3    to ask you about what a lawyer has told you.  Don't
4    try and tell me what a lawyer has told you.  Okay?
5            Other than that, have you been
6    given any information as to what happened or may
7    have happened to cause this accident?
8    A.   Yes, sir.
9    Q.   Okay.  And, again, I don't want to know
10   what a lawyer has told you, so don't go telling me
11   that.
12           Tell me what you know other than
13   what a lawyer has told you.
14   A.   Well, I understand that the man put the
15   ladder up on a tree on the -- on the wrong side with
16   a sloping ground.  I do know that the man had used
17   the ladder six or seven times prior to that.  I do
18   know that the man put the ladder up with one safety
19   cross strap on it instead of two.  I do know that
20   there was no ladder defect.  It did not fail due to
21   quality control production.  And I do know that the
22   product was used and human error caused the
23   accident.
24           MS. POWERS:  I'm going to move to
25   strike that answer and also your question, although

1    I am a bit late, as calling for speculation on his
2    part.  There's no foundation for him to give that
3    testimony.
4            MR. SANDERS:  Your objection is
5    overruled, Counsel.
6            But -- and I'll just note for the
7    record that that answer was totally responsive to
8    the question.  So if the question was appropriate,
9    then the answer was appropriate.
10           MS. POWERS:  Well, the question --
11   Well, I'm objecting to the question also.
12           MR. SANDERS:  I understand that.
13   Q.   (By Mr. Sanders) Is it -- Now you're a
14   person that's been in the business of selling tree
15   stands for quite some time, right?
16   A.   That, I have.
17   Q.   Is it fair to say that you've had some
18   experience with tree stands?
19   A.   Very much so.
20   Q.   Are you a hunter?
21   A.   Yes, I am.
22   Q.   Have you used tree stands?
23   A.   Yes, sir.
24   Q.   How many years have you been using tree
25   stands?

1    A.   Probably 22 years.
2    Q.   So you're a tree stand user for 22 years,
3 as well as having been in the business for a number
4 of years of selling them?
5    A.   Yes, sir.
6    Q.   And you've evaluated different tree stands
7 over the years?
8    A.   Yes, sir.
9    Q.   And you've evaluated the design and
10 manufacture of -- in general terms, of the tree
11 stand that we're talking about here, the Cabela's 15
12 foot?
13    A.   Yes, sir.
14    Q.   And based on that and what information you
15 have about this accident, have you reached the
16 conclusion that it was simply mistake in use or
17 misuse by Mr. Gray that brought about his accident?
18         MS. POWERS:  I object to the
19 question.  It's calling for speculation.  He is not
20 here to testify as an expert witness in this case.
21 He had -- You have laid no foundation for the
22 information he has regarding the incident.  He
23 hasn't spoken to Mr. Gray.  I object.
24    Q.   (By Mr. Sanders) You can still answer the
25 question.  If you don't remember it, she'll read it

1 back to you.
2    A.   I don't remember it.
3         MS. POWERS:  Calling for an expert
4 opinion also.
5         MR. SANDERS:  Read it back for him,
6 please.
7         THE COURT REPORTER:  "And based on
8 that and what information you have about this
9 accident, have you reached the conclusion that it
10 was simply mistake in use or misuse by Mr. Gray that
11 brought about his accident?"
12         MS. POWERS:  Same objection.  And
13 I'll add that that is calling for a legal
14 conclusion.
15         THE WITNESS:  Okay.  I feel that
16 the gentleman, Mr. Gray, misused this ladder.
17         MR. SANDERS:  All right.  I have no
18 more questions.
19         Whoever is next, have at it.  You
20 can sit here if you'd like to since he's got the
21 hearing issue and you need to speak up.
22         Are you going next then or is Ed?
23         MS. POWERS:  I'm going next.  Yeah.
24 I think I --
25         MR. SANDERS:  Go ahead.

1         MS. POWERS:  I think I'll be fine
2 here.  Thank you.
3              EXAMINATION
4 BY MS. POWERS:
5    Q.   Have you ever spoken to Dan Gray?
6    A.   No, ma'am, I have not.
7    Q.   Have you ever spoken to a witness in the
8 case by the name of Mike Maygar?
9    A.   No, ma'am, I have not.
10    Q.   Have you reviewed the deposition
11 transcripts of either of those gentlemen?
12    A.   Yes, ma'am, I have.
13    Q.   When did you review those deposition
14 transcripts?
15    A.   When I -- When they were presented to me,
16 probably three or four months ago.
17    Q.   Who else have you spoken to regarding the
18 incident, the injury that took place?
19    A.   No one.  Just read the depo.
20    Q.   All right.  Now, you weren't there, is that
21 correct, when this incident took place on
22 September 11th?
23    A.   No, ma'am.
24    Q.   You have expertise with tree stands; is
25 that right?

1    A.   Yes, ma'am.
2    Q.   I think you stated in your Answers to
3 Interrogatories that you have -- that you're an
4 expert in the use and assembly and safety of tree
5 stands; is that correct?
6    A.   Well, not an expert.  I follow all the
7 TMA -- upcoming TMA standards and rules and safety
8 for tree stands.
9    Q.   What is your educational background?
10    A.   I have just a twelfth grade education.
11    Q.   What work experience did you have before
12 forming BBK Enterprises?
13    A.   I was a painting contractor for 30 years.
14    Q.   During the time you were a painting
15 contractor, did you have any involvement with tree
16 stands at all?
17    A.   Yes, ma'am.  I was dabbling with ladder
18 stands and tripods.
19    Q.   What do you mean you were dabbling with
20 them?
21    A.   I was converting conventional ladder stands
22 that you would purchase at Home Depot or anywhere
23 and converting them into a ladder stand and trying
24 to find welders that would build me my own tripods
25 so I could -- I could go hunting with my own

1   products.
2       Q.   When you were converting these conventional
3   ladder stands, was that to use the products for your
4   own use?
5       A.   Personal use.
6       Q.   And during what year was that when you
7   started doing that?
8       A.   That was in '95, '96.
9       Q.   Is that how you became interested in going
10  into the business of hunting equipment?
11      A.   Yes, ma'am.
12      Q.   Did you work for any companies or have a
13  business on your own having to do with sale of
14  hunting equipment before you formed BBK Enterprises?
15      A.   No, ma'am.
16      Q.   You were a member of the Tree Stand
17  Manufacturers Association?
18      A.   Yes, ma'am, I am.
19      Q.   When did you become a member?
20      A.   I believe I joined in either 2000 -- No.
21  Yeah. 2000 or 2001.
22      Q.   Do you attend meetings with that
23  organization?
24      A.   Yes, ma'am, I do.
25      Q.   Before you joined the organization, did you

1   attend any meetings?
2       A.   Yes, I did.
3       Q.   When did you first attend a meeting?
4       A.   I believe I started attending the first
5   meeting in '99 and 2000.
6       Q.   What kind of information do you receive at
7   those meetings?  What do they talk about?
8       A.   They talk about upcoming problems that the
9   members, the board members, are -- are experiencing.
10  They were starting to push into more informing
11  the -- the end user of the product.  There was more
12  of a push to go into instructions.
13              And then the -- at that time the
14  big push was changing from a chest strap harness
15  that's inside this instructions to a four point
16  harness that was put in the TMA standards and TMS 04
17  in 19 -- in 2004.
18      Q.   What is the overall goal of the
19  organization?
20      A.   Providing the end user the most safest
21  stand that they can have in -- in -- in sales, in
22  the public stream.
23      Q.   All right.  And that was true in 1999 also
24  when you first attended meetings?
25      A.   Yes, ma'am.

1       Q.   And at these meetings you would receive
2   tree stand safety information?
3       A.   Information, yes, ma'am.
4       Q.   Did they give you information about
5   statistics about injuries using tree stands?
6       A.   No.  They would just basically say that
7   we -- you know, the industry needs to move in this
8   direction and, you know, we need to form a
9   testing -- get testing firms to start testing
10  product where it's available for everybody that
11  manufactures product.
12      Q.   All right.  Did you, during your membership
13  with the TMA beginning in 2000 or 2001, receive
14  literature from that organization?
15      A.   No, ma'am.
16      Q.   Did you get e-mails?  Were you on a list
17  serve, any kind of source of information?
18      A.   No.  I wasn't -- I wasn't a member at that
19  time.  I was an outsider looking in, so I went to
20  the meetings at the TMA shows.
21      Q.   All right.  Do you currently, as a member,
22  receive literature?  Are you on a list serve,
23  anything like that from TMA?
24      A.   I'm on the board.
25      Q.   What's your position on the board?

1       A.   Secretary.
2       Q.   How long have you been on the board?
3       A.   I've been on the board -- This is my third
4   year.
5       Q.   When you first started BBK Enterprises
6   in -- I believe you said 1998?
7       A.   I would say it was -- it was formed in
8   1990.
9       Q.   Oh, I'm sorry.
10      A.   But --
11      Q.   1990?
12      A.   Yes, ma'am.  The corporate -- The papers, I
13  believe, were done in 1990.
14      Q.   Okay.  When you just first started BBK
15  Enterprises in 1990, did you go to any -- attend any
16  meetings with any other organizations?
17      A.   No, ma'am.
18      Q.   Did you review any literature on the
19  manufacture of tree stands?
20      A.   No, ma'am.
21      Q.   All right.  How did you come about your
22  knowledge of how to design -- about the design and
23  manufacture of tree stands?
24      A.   In -- With my entrepreneurness and my
25  current business that I had in construction and